Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
REGIÓN JUDICIAL DE SAN JUAN
PANEL XI-ESPECIAL

| | | |
|---|---|---|
| EL PUEBLO DE PUERTO RICO<br><br>Peticionario<br><br><br>V.<br><br><br>MAYRA ENID NEVÁREZ TORRES<br><br>Recurrida | KLCE202300933 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.:<br>KLE2022G0122<br>KLE2022G0123<br>KLE2022G0124<br>KLE2021M0047<br>KTR2021-0605<br>KTR2021-0606<br><br>Sobre:<br>Art. 7.06 Ley 22 grave (2 cargos)<br>Art. 5.07 (C) Ley 22 grave<br>Art. 5.07 (B) Ley 22 menos grave<br>Art. 7.02 Ley 22 menos grave<br>Art. 5.07 Ley 22 menos grave |

Panel integrado por su presidenta; la Juez Lebrón Nieves, el Juez Adames Soto y la Jueza Martínez Cordero

*Lebrón Nieves, Juez Ponente*

## SENTENCIA

En San Juan, Puerto Rico, a 30 de octubre de 2023.

El 21 de agosto de 2023, acudió ante este foro revisor, el Pueblo de Puerto Rico, representado por la Oficina del Procurador General de Puerto Rico (en adelante, parte peticionaria), por medio de *Petición de Certiorari.* Mediante esta, nos solicita que revisemos y revoquemos la *Resolución* emitida y notificada el 21 de julio de 2023, por el Tribunal de Primera Instancia, Sala Superior de San Juan. En virtud del aludido dictamen, el foro *a quo* declaró Ha Lugar la *Moción de Supresión de Evidencia* presentada por la señora Mayra Enid Nevárez Torres (en adelante, parte recurrida o señora

Nevárez Torres), y consecuentemente, suprimió la evidencia relacionada con la muestra de sangre que se le tomó, y cualquiera de sus frutos.

Por los fundamentos que adelante se esbozan, se expide el auto de *certiorari* y se revoca el dictamen recurrido.

**I**

El caso que nos ocupa tiene su génesis en seis denuncias presentadas en contra de la señora Nevárez Torres por unos hechos ocurridos el 21 de noviembre de 2021.  En tres de las denuncias se le imputó haber infringido los artículos 5.07, 5.07(b) y 7.02 – delitos menos graves – de la Ley Núm. 22 de 7 de enero de 2000, según enmendada.  Las otras tres denuncias fueron por delitos graves, en específico por infracciones a los artículos 5.07(c) y 7.06 de la Ley Núm. 22-2000, *supra.*  Luego de evaluar la prueba presentada por el Ministerio Público, el foro primario halló causa para arresto por los delitos imputados en las denuncias.

De igual forma, el 3 y 4 de marzo de 2023, fue celebrada la vista preliminar, donde el foro *a quo* determinó causa probable para juicio.  A estos efectos, el Ministerio Público presentó las siguientes acusaciones en contra de la parte recurrida por los delitos graves imputados:

La primera acusación fue por infracción al Art. 5.07(C) de la Ley 22-2000, *supra*:

> La referida acusada, MAYRA ENID NEV[Á]REZ TORRES, allá en o para el día 21 de noviembre de 2021 y en San Juan, Puerto Rico; que forma parte de la jurisdicción del Tribunal de Primera Instancia de Puerto Rico, Sala de San Juan, de forma imprudente y/o negligentemente temeraria, con menosprecio de la seguridad de las personas y propiedades, violó lo dispuesto en el Art. 5.07 (C) de la Ley 22 de Vehículos y Tránsito de Puerto Rico, consistente en que mientras conducía el vehículo de motor marca Hyundai, modelo Tucson, tablilla ITM-346, por el Puente Teodoro Moscoso en dirección de Carolina a San Juan, que es una vía pública de Puerto Rico, la misma lo hacía bajo los efectos de bebidas embriagantes, en estado de embriaguez y en contra del tránsito, conduciendo en

dirección de San Juan a Carolina y por tal razón provocó un accidente cuando impactó al vehículo de motor Can Am tablilla JNW-782 donde le causó la muerte a Justin Rafael Santos Delanda.

La segunda acusación fue por infracción al Art. 7.06 Grave de la Ley 22-2000, *supra*, primer cargo:

La referida acusada, MAYRA ENID NEV[Á]REZ TORRES, allá en o para el día 21 de noviembre de 2021 y en San Juan, Puerto Rico; que forma parte de la jurisdicción del Tribunal de Primera Instancia de Puerto Rico, Sala de San Juan, ilegal, voluntaria, maliciosa y criminalmente, violó lo dispuesto en el Art. 7.06 de la Ley 22 de Vehículos y Tránsito de Puerto Rico, consistente en que mientras conducía el vehículo de motor marca Hyundai, modelo Tucson, tablilla ITM-346, por el Puente Teodoro Moscoso en dirección de Carolina a San Juan, que es una vía pública de Puerto Rico, la misma lo hacía bajo los efectos de bebidas embriagantes, en estado de embriaguez y en contra del tránsito conduciendo en dirección de San Juan a Carolina, ocasionando un choque cuando impactó al vehículo de motor Can Am tablilla JNW-782 y causándole la muerte a Justin Rafael Santos Delanda. A la referida imputada se le tomó la muestra de sangre 21-0459 por la enfermera Gina Sofía Encarnación Soliman, Lic. 36113, arrojando .29% de alcohol en su organismo. Esta presentaba los siguientes signos aparentes: olor a alcohol, ojos rojos y hablar pesado.

La tercera acusación fue por infracción al Art. 7.06 Grave de la Ley 22-2000, *supra*, segundo cargo:

La referida acusada, MAYRA ENID NEV[Á]REZ TORRES, allá en o para el día 21 de noviembre de 2021 y en San Juan, Puerto Rico; que forma parte de la jurisdicción del Tribunal de Primera Instancia de Puerto Rico, Sala de San Juan, ilegal, voluntaria, maliciosa y criminalmente, violó lo dispuesto en el Art. 7.06 de la Ley 22 de Vehículos y Tránsito de Puerto Rico, consistente en que mientras conducía el vehículo de motor marca Hyundai, modelo Tucson, tablilla ITM-346, por el Puente Teodoro Moscoso en dirección de Carolina a San Juan, que es una vía pública de Puerto Rico, la misma lo hacía bajo los efectos de bebidas embriagantes, en estado de embriaguez y en contra del tránsito conduciendo en dirección de San Juan a Carolina, ocasionando un choque cuando impactó al vehículo de motor Can Am tablilla JNW-782 y causándole grave daño corporal a Keven Xilef Monserrate Gandía; consistente en daño pulmonar, fractura en el fémur y hospitalización prolongada. A la referida imputada se le tomó la muestra de sangre 21-0459 por la enfermera Gina Sofía Encarnación Soliman, Lic. 36113, arrojando .29% de alcohol en su organismo. Esta presentaba los siguientes signos aparentes: olor a alcohol, ojos rojos y hablar pesado; y en ocasiones incongruente.

Así las cosas, el 29 de junio de 2022, la parte recurrida presentó la *Moción de Supresión de Evidencia*. En esencia, arguyó que las muestras de sangre extraídas del cuerpo de la señora Nevárez Torres no fueron obtenidas de conformidad con los parámetros legales y constitucionales, y que fueron obtenidas en violación al debido proceso de ley y a los derechos constitucionales dispuestos por la Constitución del Estado Libre Asociado de Puerto Rico y bajo la Cuarta Enmienda de la Constitución Federal de los Estados Unidos. Añadió que, la toma de muestras de sangre constituyó una intrusión física realizada por el Estado sin orden judicial y sin el consentimiento de la parte recurrida. Sostuvo que, la Policía de Puerto Rico contó con tiempo suficiente para solicitar una orden judicial con el propósito de obtener las muestras de sangre. Asimismo, indicó que le correspondía al Estado advertirle a la parte recurrida sobre su derecho a negarse a que le extrajeran las muestras de sangre y que, sin embargo, le impartieron unas advertencias defectuosas. Conforme a lo anterior, solicitó la supresión de las muestras de sangre.

En respuesta, la parte peticionaria presentó la *Oposición a la Moción de Supresión de Evidencia*. Por medio de esta, refutó lo argumentado por la parte recurrida, y sostuvo que, la señora Nevárez Torres brindó su consentimiento voluntario para la toma de muestras de sangre, luego de que se le hicieran las debidas advertencias de ley. De acuerdo a ello, adujo que, el consentimiento hacía innecesario la obtención de una orden judicial. Es por lo que, solicitó al foro primario que declarara No Ha Lugar la solicitud de supresión de evidencia de la parte recurrida.

Posteriormente, el 28 de octubre de 2022, el Tribunal de Primera Instancia celebró la primera vista sobre supresión de evidencia. Asimismo, los días 9, 29 y 30 de noviembre de 2022, 1 de diciembre de 2022, 30 de enero de 2023, 7 y 8 de marzo de 2023,

26 de abril de 2023, 13 y 14 de junio de 2023, 14 y 18 de julio de 2023, fue celebrada la continuación de la *Vista de Supresión de Evidencia.* En la vista, el Ministerio Público presentó los testimonios de la enfermera Gina Encarnación Soliman (en adelante, señora Encarnación Soliman), la enfermera generalista Josymar López Camacho (en adelante, señora López Camacho), del agente Benedicto Oquendo Torres (en adelante, agente Oquendo Torres), del enfermero Xavier Rivera Delgado (en adelante, señor Rivera Delgado), del señor Salvador Fabre Rivera (en adelante, señor Fabre Rivera), y del señor Héctor Figueroa Ramos (en adelante, señor Figueroa Ramos). Mientras que la parte recurrida presentó el testimonio del señor Evaristo Álvarez Ghigliotti (en adelante, señor Álvarez Ghigliotti). De igual manera, la prueba presentada por el Ministerio Público se basó en nueve Exhibits[1], mientras que la defensa presentó un exhibit[2].

Luego de evaluada la prueba presentada en sala, el Tribunal de Primera Instancia emitió la *Resolución* cuya revisión nos atiene. En virtud de esta, el foro primario razonó que, el Ministerio Público no había logrado demostrar que el registro que se llevó a cabo fue razonable, ni que la intervención con la señora Nevárez Torres fue justificada. Concluyó que, la toma de muestra de sangre de la señora Nevárez Torres fue un registro sin orden, irrazonable, que se

---

[1] Exhibit 1 del Ministerio Público: Certificado de Registro de la Oficina de Reglamentación y Certificación.
Exhibit 2 del Ministerio Público: Documento Advertencia a Persona Bajo los Efectos de Bebidas Embriagantes, Drogas o Sustancias Controladas.
Exhibit 3: Informe de Análisis Toxicológico tomado a la señora Nevárez Torres emitido por el Departamento de Salud.
Exhibit 4: Certificación de Registro de la enfermera Encarnación Soliman.
Exhibit 5: Identificación #1: Parte de remisión, Información del intervenido, consta de 2 folios, una original y una copia.
Exhibit 6: Certificación de Registro, expedida por el Departamento de Salud, número 272910, a: Jarell Acevedo Nazario como enfermera generalista, licencia 093292, válida desde el 22 de julio de 2020, vence el 22 de julio de 2022.
Exhibit 7: fotocopia de Certificación de Registro, expedida por el Departamento de Salud; número 324397, a Xavier Rivera Delgado licencia 089876, vence el 21-06-25.
Exhibit 8: Orientación sobre el Manejo y Estudio de Documentos Dubitados.
Exhibit 9: Certificado de Análisis Sección de documentos dudosos.
[2] Exhibit 1: Informe preparado por el señor Evaristo Álvarez Ghigliotti.

llevó a cabo sin motivos fundados y que no fue válidamente consentido por esta, al entender que no cumplió con los requisitos dispuestos por nuestro ordenamiento jurídico. Consecuentemente, declaró Ha Lugar la *Moción de Supresión de Evidencia* presentada por parte recurrida y suprimió toda la evidencia relacionada con la muestra de sangre.

Inconforme con la determinación del foro recurrido, la parte peticionaria acudió ante este Tribunal por medio de un recurso de *certiorari* y realizó el siguiente señalamiento de error:

- El Tribunal de Primera Instancia cometió un error de derecho y abusó crasamente de su discreción al <u>ignorar</u> la prueba testifical presentada en la vista de supresión, no evaluar la totalidad de las circunstancias en el presente caso y suprimir la muestra de sangre que la señora Nevárez Torres brindó libre y voluntariamente.

Con el beneficio de la comparecencia de las partes, procedemos a resolver.

**II**

### A. El Certiorari

El certiorari es un recurso extraordinario mediante el cual un tribunal de jerarquía superior puede revisar discrecionalmente una decisión de un tribunal inferior. *Rivera et al. v. Arcos Dorados et al.*, 2023 TSPR 65, 212 DPR ___ (2023); *Torres González v. Zaragoza Meléndez*, 2023 TSPR 46, 211 DPR ___ (2023); *Caribbean Orthopedics v. Medshape et al.*, 207 DPR 994, 1004 (2021); *Pueblo v. Rivera Montalvo*, 205 DPR 352, 372 (2020).[3] La expedición del auto de *certiorari* descansa en la sana discreción del foro apelativo. *Torres González v. Zaragoza Meléndez*, supra. Ahora bien, tal "discreción no opera en lo abstracto. A esos efectos, la Regla 40 del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 40, dispone los criterios que dicho foro deberá considerar, de manera

---

[3] Véase *Medina Nazario v. McNeil Healthcare LLC*, 194 DPR 723, 728-729 (2016); *IG Builders et al. v. BBVAPR*, 185 DPR 307, 337-338 (2012).

que pueda ejercer sabia y prudentemente su decisión de atender o no las controversias que le son planteadas". *Torres Martínez v. Torres Ghigliotty*, 175 DPR 83, 97 (2008); *Rivera et al. v. Arcos Dorados et al.*, supra; *Pueblo v. Rivera Montalvo*, supra, pág. 372. La precitada Regla dispone lo siguiente:

> El Tribunal tomará en consideración los siguientes criterios al determinar la expedición de un auto de certiorari o de una orden de mostrar causa:
>
> (A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.
>
> (B) Si la situación de hechos planteada es la más indicada para el análisis del problema.
>
> (C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.
>
> (D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.
>
> (E) Si la etapa de los procedimientos en que se presenta el caso es la más propicia para su consideración.
>
> (F) Si la expedición del auto o de la orden de mostrar causa no causa un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.
>
> (G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia. 4 LPRA Ap. XXII-B, R. 40.

No obstante, "ninguno de los criterios antes expuestos en la Regla 40 del Reglamento del Tribunal de Apelaciones, supra, es determinante, por sí solo, para este ejercicio de jurisdicción, y no constituye una lista exhaustiva". *García v. Padró*, 165 DPR 324, 327 (2005). Por lo que, de los factores esbozados "se deduce que el foro apelativo intermedio evaluará tanto la corrección de la decisión recurrida, así como la etapa del procedimiento en que es presentada; esto, para determinar si es la más apropiada para intervenir y no ocasionar un fraccionamiento indebido o una dilación injustificada del litigio". *Torres Martínez v. Torres Ghigliotty*, supra, pág. 97.

El certiorari, como recurso extraordinario discrecional, debe ser utilizado con cautela y solamente por razones de peso. *Pérez v. Tribunal de Distrito*, 69 DPR 4, 7 (1948). Este procede cuando no está disponible la apelación u otro recurso que proteja eficaz y rápidamente los derechos del peticionario. *Pueblo v. Tribunal Superior*, 81 DPR 763, 767 (1960). Nuestro Tribunal Supremo ha expresado también que "de ordinario, el tribunal apelativo no intervendrá con el ejercicio de la discreción de los tribunales de instancia, salvo que se demuestre que hubo un craso abuso de discreción, o que el tribunal actuó con prejuicio o parcialidad, o que se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo, y que nuestra intervención en esa etapa evitará un perjuicio sustancial". *Zorniak Air Servs. v. Cessna Aircraft Co.*, 132 DPR 170, 181 (1992*); Rivera y otros v. Bco. Popular*, 152 DPR 140, 155 (2000).

### B. Registros y Allanamientos

Según es sabido, la Cuarta Enmienda de la Constitución de Estados Unidos, así como la Constitución de Puerto Rico, integran protecciones para todos los individuos y sus pertenencias contra registros, incautaciones y allanamientos irrazonables. *Pueblo v. Salamanca Corchado*, 210 DPR 582, 589-590 (2022); *Pueblo v. Rivera Surita*, 202 DPR 800, 805 (2019). En particular, la Constitución de Puerto Rico, en su Artículo II, Sección 10, dispone que no se violará el derecho de los ciudadanos a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.[4] Asimismo, establece que únicamente serán expedidos los mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, cuando exista causa probable.[5]

---

[4] Art. II, Sec. 10, Const. ELA [Const. PR], LPRA Tomo 1.
[5] Const. ELA [Const. PR], *supra.*

El Tribunal Supremo ha señalado que, la anterior protección constitucional tiene tres objetivos, estos son: "(1) disuadir a los funcionarios del orden público para que no violen la Constitución, (2) proteger la integridad de los tribunales al no permitir que en los procesos judiciales se utilice evidencia obtenida ilegalmente, y (3) evitar que el Estado se beneficie de sus propios actos ilegales". *Pueblo v. Rivera Surita*, supra, pág. 806. La evidencia que sea obtenida en violación a la Sección 10 de nuestra Constitución, será inadmisible en los tribunales.[6] *Pueblo v. Salamanca Corchado*, supra, pág. 590.

Como regla general, cuando se aspire a efectuar un registro o allanamiento, será necesario previamente obtener una orden judicial. *Pueblo v. López Colón*, 200 DPR 273, 284-285 (2018). Es por ello que, cuando se levanta una alegación de violación al derecho constitucional dispuesto en la Sec. 10 del Art. II de la Constitución de Puerto Rico, será necesario resolver primeramente, si ocurrió un registro que hubiese infringido la expectativa razonable de intimidad reconocida a un individuo sobre el registro. *Íd.*; *Pueblo v. Báez López*, 189 DPR 918, 927 (2013). Nuestro Máximo Foro ha enumerado varios factores a considerar para determinar si la persona registrada ostentaba una expectativa razonable de intimidad, estos son: 1) el lugar registrado o allanado; 2) la naturaleza y grado de intrusión de la intervención policiaca; 3) el objetivo o propósito de la intervención; 4) si la conducta de la persona era indicativa de una expectativa subjetiva de intimidad; 5) la existencia de barreras físicas que restrinjan la entrada o visibilidad al lugar registrado; 6) la cantidad de personas que tienen acceso legítimo al lugar registrado, y 7) las inhibiciones sociales relacionadas con el lugar registrado. Cabe destacar que, ninguno de los mencionados factores es determinante,

---

[6] Const. ELA [Const. PR], *supra.*

debiendo examinarse todos en conjunto. *Pueblo en interés menor NOR*, 136 DPR 949, 962 (1994). Siendo así, deberá establecerse un balance entre la expectativa de intimidad del ciudadano, protegida por la garantía constitucional, y aquellos intereses públicos que hubiesen motivado la actuación estatal. *Pueblo v. López Colón*, supra, pág. 285; *Pueblo v. Díaz Bonano*, 176 DPR 601, 613 (2009).

Es normativa reiterada que, un registro efectuado sin mediar una orden judicial activa la presunción de que este fue irrazonable e inválido. *Pueblo v. López Colón*, supra, págs. 287-288. Ahora bien, un registro sin una orden previa del tribunal, por sí solo, no conlleva su inadmisibilidad. *Pueblo v. Báez López*, supra, pág. 930. El Tribunal Supremo ha adoptado y definido ciertas situaciones excepcionales en las que no será indispensable una orden judicial previa. La Alta Curia enfatizó que, cada una de estas situaciones no responden a reglas automáticas y deberán examinarse a la luz de los hechos específicos de cada caso. *Íd.* En las siguientes situaciones no existe una expectativa razonable de intimidad, y por ello no se violenta el mandato constitucional:

> (1) un *registro incidental a un arresto legal, Pueblo v. Pacheco Báez*, 130 DPR 664 (1992) [...]; **(2) un registro consentido voluntariamente de forma expresa o implícita** [...]; (3) un *registro en situación de emergencia*, [...]; (4) una *evidencia ocupada en el transcurso de una persecución* [...]; (5) una *evidencia a plena vista*, [...]; (6) cuando el agente del orden público obtiene conocimiento de la existencia del material delictivo por el olfato [...]; (7) una *evidencia arrojada o abandonada* [...]; (8) un *registro o allanamiento de una estructura abandonada* [...]; (9) una *evidencia obtenida durante un registro administrativo*, [...], siempre que se cumpla con las limitaciones expresadas por este Tribunal en *Blassini et als. v. Depto. Rec. Naturales*, supra; (10) un *registro tipo inventario*, [...], u (11) una *evidencia obtenida en un lugar público —como el aeropuerto— como resultado de la utilización de canes para olfatear*. [...] *Pueblo v. Báez López*, supra, págs. 930-932. (*Énfasis nuestro*).[7]

---

[7] Véase también *Pueblo v. López Colón*, supra, pág. 288.

Según esbozado, el registro consentido voluntariamente de forma expresa o implícita (tácita) constituye una de las excepciones donde no será necesario la existencia de una orden judicial. *Íd.*; *Pueblo en interés menor NOR*, supra, pág. 965. En *Birchfield v. North Dakota*, 579 US 438 (2016), el Tribunal Supremo de Estados Unidos afirmó que "*[i]t is well established that a search is reasonable when de subject consents*". Respecto al consentimiento implícito, este se dará cuando una "**persona obedece sin protestar al pedido de un funcionario; la persona no accede expresamente pero su acto, en unión a un examen de la totalidad de las circunstancias, demuestra su intención de consentir el registro**". *Pueblo en interés menor NOR*, supra, 965-966. (*Énfasis nuestro*).

Los criterios a ser evaluados para determinar si medió una renuncia expresa o tácita son los siguientes: 1) si medió fuerza o violencia; 2) si el registro fue practicado después de un arresto, y 3) si se encontraban otras personas presentes. *Íd.* pág. 966; *Pueblo v. López Colón*, supra, pág. 289. Empero, la prueba sobre la aludida renuncia debe ser clara y demostrativa de la inexistencia de coacción verdadera de clase alguna, directa o indirecta. *Pueblo en interés menor NOR*, supra, pág. 966.

La voluntariedad de la renuncia dependerá de la totalidad de las circunstancias. *Íd.*, citando a *Schenckloth v. Bustamonte*, 412 US 218 (1973); *Pueblo v. Santiago Alicea I*, 138 DPR 230, 236 (1995). **No es requerido que el titular del derecho esté consciente expresamente de que tiene derecho a no consentir**, su importancia se basa en demostrar la legítima necesidad de practicar el registro y la ausencia de coacción física o psicológica. *Pueblo en interés menor NOR*, supra, pág. 966. En el examen sobre la totalidad de las circunstancias, será menester considerar las características de la persona que ha consentido el registro, entre otros factores como: "la edad, la inteligencia aparente, si hubo advertencia previa

de los derechos constitucionales, cuánto tiempo estuvo detenido previo a éste prestar el consentimiento, si hubo coacción física o si se estaba bajo custodia policiaca". *Íd.* pág. 967; *Pueblo v. Santiago Alicea I,* supra, pág. 236. Los factores reseñados no deberán ser aplicados de forma mecánica, sino que deberán utilizarse como una guía en el análisis de cada caso. *Íd.*

Por otro lado, los tribunales también deberán tomar en consideración, si en adición existieron tretas o engaños, promesas o indicación de la existencia de alguna clase de coacción. Igualmente, si el consentimiento fue prestado en un lugar público o mientras se encontraban en una estación de policía, y a su vez, si existiere alguna indicación de deficiencia mental o cualquier otro motivo que le impida a la persona escoger libremente entre las alternativas de consentir o no. *Pueblo en interés menor NOR*, supra, pág. 967.

Nuestra más alta Curia mencionó que, la Constitución de Puerto Rico ha reconocido como parte del derecho a la intimidad, la protección sobre la persona, la cual incluye su cuerpo. En ese sentido, existe un registro cuando se examina en el cuerpo de una persona. P*ueblo en interés menor NOR*, supra, pág. 962-963. Bajo ese mismo supuesto, el Tribunal Supremo de los Estados Unidos, resolvió que, las pruebas de alcohol en la sangre constituían el registro de una persona. *Schmerber v. California,* 384 US 757, 767 (1966); *Birchfield v. North Dakota,* 579 US 438, 455 (2016). Por ende, le aplica la protección constitucional contra registros irrazonables. En esa vertiente, la protección se extiende hacia los conductores de vehículos de motor bajo los efectos de alcohol, en las situaciones donde el Estado pretenda realizarle una prueba de alcohol en la sangre. *Íd.* Ello, debido a que las pruebas de sangre constituyen una intrusión significativa en el cuerpo de la persona. *Íd.* pág. 463; *Missouri v. McNeely,* 569 US 141 (2013). Tal intrusión incide en la expectativa de privacidad de la persona. *Íd.*

Conforme a la normativa vigente, como norma general, se requiere la previa obtención de una orden judicial para realizar una prueba de sangre *no consentida*. Es por lo que, el foro federal expresó que, será necesario evaluar si la actuación del Estado, al solicitarle a una persona que se realice una prueba de sangre estuvo justificada, y si los medios y procedimientos empleados para la toma de la muestra, respetaban los estándares de razonabilidad pertinentes. *Schmerber v. California,* supra, pág. 768. Sin embargo, pueden surgir varias situaciones donde se justifique un registro sin orden. *Missouri v. McNeely,* supra, pág. 1558. En estos casos, será perentorio realizar un análisis para determinar si el registro sin orden judicial fue razonable y evaluar si las circunstancias particulares del caso lo ameritaban. *Birchfield v. North Dakota,* supra, pág. 455. Es decir, será necesario que los tribunales examinen la totalidad de las circunstancias. *Missouri v. McNeely,* supra, pág. 1559.

### C. Regla 234 Supresión de Evidencia

Cónsono con lo anterior, la Regla 234 de las de Procedimiento Criminal, 34 LPRA Ap. II, R. 234, regula lo concerniente a las circunstancias por las cuales una persona agraviada por un allanamiento o registro ilegal, podrá solicitar una supresión de evidencia. *Pueblo v. Nieves Vives,* 188 DPR 1, 15 (2013). Dicha regla estatuye lo siguiente:

> La persona agraviada por un allanamiento o registro ilegal podrá solicitar del tribunal al cual se refiere la Regla 233 la supresión de cualquier evidencia obtenida en virtud de tal allanamiento o registro, o la devolución de la propiedad, por cualquiera de los siguientes fundamentos:
>
> (a) Que la propiedad fue ilegalmente ocupada sin orden de allanamiento o registro.
>
> (b) Que la orden de allanamiento o registro es insuficiente de su propia faz.

(c) Que la propiedad ocupada o la persona o sitio registrado no corresponde a la descripción hecha en la orden de allanamiento o registro.

(d) Que no había causa probable para creer en la existencia de los fundamentos en que se basó la orden de allanamiento o registro.

(e) Que la orden de allanamiento fue librada o cumplimentada ilegalmente.

(f) Que es insuficiente cualquier declaración jurada que sirvió de base a la expedición de la orden de allanamiento porque lo afirmado bajo juramento en la declaración es falso, total o parcialmente. 34 LPRA Ap. II, R. 234.

El Tribunal Supremo ha enfatizado que, para poder presentar una moción de supresión de evidencia será necesaria la existencia y exposición de fundamentos para invocarla, además, deberá incluir los hechos específicos en los cuales se sostiene. *Pueblo v. Rivera Surita*, supra, pág. 806; *Pueblo v. Serrano Reyes*, 176 DPR 437, 446 (2009). De igual manera, el foro primario escuchará prueba sobre cualquier cuestión de hecho que fuese necesaria para la resolución de tal solicitud y deberá celebrar una vista evidenciaria. *Pueblo v. Nieves Vives*, supra, pág. 15. La obligación de celebrar una vista evidenciaria con antelación al juicio, se dará cuando se trate de evidencia incautada sin previa orden judicial cuando en la solicitud, la parte promovente aduzca hechos o fundamentos que reflejen la ilegalidad o irrazonabilidad del registro, allanamiento o incautación. *Íd.* Ello, debido a que todo registro realizado sin una orden levanta una presunción de que fue irrazonable, y consecuentemente, inválido. *Pueblo v. Serrano Reyes*, supra, pág. 447. Esa presunción de ilegalidad le impone al Ministerio Público la carga probatoria de demostrar que el registro fue legal y la razonabilidad de la actuación del Estado. *Íd.* págs. 447-448. De acuerdo con lo anterior, en la vista evidenciaria, el Ministerio Público tendrá la obligación de refutar la presunción de ilegalidad del registro o incautación, de presentar prueba y deberá establecer los elementos que sustenten

la excepción correspondiente al requisito de orden judicial previa. *Pueblo v. Nieves Vives*, supra, pág. 15.

Si el tribunal determina que la evidencia incautada o el registro fue llevado a cabo en violación al mandato constitucional y a lo dispuesto en la precitada regla, deberá suprimir la evidencia obtenida. Consecuentemente, la prueba no será admisible en los tribunales como prueba sustantiva de la comisión de un delito. *Pueblo v. Blase Vázquez*, 148 DPR 618, 628 (1999).

Esbozada la normativa jurídica que enmarca la controversia de epígrafe, procedemos a resolver.

**III**

La parte peticionaria sostiene que, el foro de primera instancia cometió un error de derecho y abusó crasamente de su discreción al ignorar la prueba testifical presentada en la vista de supresión, no evaluar la totalidad de las circunstancias en el presente caso y suprimir la muestra de sangre que la señora Nevárez Torres brindó libre y voluntariamente. Adelantamos que, le asiste la razón. Veamos.

Según reseñáramos, contra la señora Nevárez Torres se presentaron seis denuncias por unos hechos ocurridos el 21 de noviembre de 2021. El Foro de Primera Instancia determinó causa probable para juicio. Posteriormente, la parte recurrida presentó la *Moción de Supresión de Evidencia*, donde arguyó que, las muestras de sangre extraídas de su cuerpo el día de la ocurrencia de los hechos, no fueron obtenidas de conformidad con los parámetros legales y constitucionales. Sostuvo que, las aludidas muestras fueron obtenidas en violación al debido proceso de ley y a los derechos constitucionales esbozados en la Constitución del Estado Libre Asociado de Puerto Rico, y bajo la Cuarta Enmienda de la Constitución Federal. Acotó que, la toma de las muestras de sangre por parte del Estado constituyó una intrusión física sin orden

judicial y sin el consentimiento de la parte recurrida. De igual manera, alegó que, la Policía de Puerto Rico tuvo disponible tiempo suficiente para solicitar una orden judicial para obtener las muestras de sangre. Añadió que, le correspondía al Estado advertirle a la señora Nevárez Torres sobre su derecho a negarse a la extracción de las muestras de sangre, pero que, no obstante, le impartieron unas advertencias defectuosas. Consecuentemente, solicitó la supresión de las muestras de sangre.

Por otro lado, la parte peticionaria presentó la *Oposición a la Moción de Supresión de Evidencia.* Mediante la aludida moción, refutó lo argüido por la parte recurrida, y sostuvo que, esta última brindó su consentimiento voluntario para la toma de muestras de sangre, luego de que se le realizaran las debidas advertencias de ley. Indicó que, tal consentimiento hizo innecesario la obtención de una orden judicial.

Posteriormente, los días 28 de octubre de 2022, 9, 29 y 30 de noviembre de 2022, 1 de diciembre de 2022, 30 de enero de 2023, 7 y 8 de marzo de 2023, 26 de abril de 2023, 13 y 14 de junio de 2023, 14 y 18 de julio de 2023, fue celebrada la *Vista de Supresión de Evidencia,* en la que fueron presentados los testimonios de la señora Encarnación Soliman, la señora López Camacho, del agente Oquendo Toreres y del señor Rivera Delgado.

A continuación incluimos un resumen de los testimonios vertidos en la vista de supresión:

**Vista del 28 de octubre de 2022[8]**

*Enfermera López Camacho*

La enfermera López Camacho declaró que trabaja en el Hospital UPR Federico Trilla de Carolina (en adelante, Hospital)

---

[8] Regrabación de la vista del 28 de octubre de 2022; y, *Minuta* del 28 de octubre de 2022.

desde hace 7 años como enfermera generalista.[9] López Camacho estudió en el Recinto de Ciencias Médicas. Obtuvo el Registro de Certificación, que fue expedido por la Junta de Profesionales de la Salud. (*Exhibit 2 del Ministerio Público*). Atestiguó que, sus funciones en el Hospital eran, entre otras, evaluar pacientes y realizar "*triage*", realizar electrocardiogramas y la toma de muestras. Respecto al "*triage*", indicó que esta es la evaluación donde se verifica para qué viene el paciente y se determina qué prioridad se le va a dar, según el estado que llega a sala emergencia.[10] Manifestó que, **para la fecha del 20 de noviembre de 2021**, inició su turno en el hospital a las 7:00 p.m. y que se encontraba asignada al área de camillas.[11] Explicó que, esa área es donde se reciben a los pacientes que llegan en ambulancia.

Mencionó que, al llegar un paciente se le hace el *triage* y se le ubica en el hospital.[12] Describió el área del *triage* como un cubículo con cortinas y un *counter* donde está la computadora y la máquina para la toma de signos vitales.[13] Declaró que, esa noche se encontraba en el área de camillas con el enfermero, el Sr. Israel Báez (señor Báez), quien la estaba asistiendo con los pacientes.[14] Indicó que, las funciones de este eran asistirla en el manejo del paciente en el área del *triage.*[15]

Sostuvo que, el 21 de noviembre de 2021 en horas de la madrugada se encontraba en el área de camillas, donde observó que tenía que llamar a una paciente que venía de un accidente. Especificó que, **"la llamó por su nombre a la paciente", y la paciente "levantó la mano"**.[16] En ese momento, indicó el nombre

---

[9] Regrabación de la vista del 28 de octubre de 2022, minutos 7:00 a 10:57.
[10] Íd.
[11] Íd., minutos 11:18 a 16:00.
[12] Íd.
[13] Íd.
[14] Íd.
[15] Íd.
[16] Íd.

de la persona como **"Mayra Nevárez Torres" y la identificó en sala**.[17] Luego, se acercó a la paciente que estaba en una camilla. Procedió a mover dicha camilla para dónde estaba la computadora para hacerle el "*triage*". Declaró que le preguntó a la paciente que porqué venía; a lo que esta respondió que, por un accidente de carro.[18] Añadió que, en conjunto con su compañero, se le preguntó si era alérgica a algún medicamento, si fumaba, y si sentía dolor.[19] Especificó que, la señora Nevárez Torres respondió a todas sus preguntas y que estaba **despierta, tranquila, cooperadora** y **un poco llorosa"**.[20] Sostuvo que, **"no tuvo ningún problema con la paciente para hacerle el *triage"*.**[21] **Recalcó que su actitud era "despierta", "tranquila" y "cooperadora".**[22]

Mencionó que le hizo un EKG para verificar que el ritmo cardíaco estuviera bajo los parámetros, y se tomaron a la paciente muestras de sangre ordenadas por el médico; se le tomaron los signos vitales; se verificó que la temperatura y el pulso estuviera normal.[23] **Declaró que no tuvo ninguna dificultad para realizarle las pruebas a la paciente Nevárez Torres**[24] **y que estaba en actitud de cooperadora.**[25] Añadió que, le puso un pañal a la paciente porque tenía la ropa húmeda y no olía bien.[26] Manifestó **que ella accedió a que se le colocara el pañal, pero le pidió "verbalmente" que no le quitaran la ropa.**[27] **La paciente verbalmente, le dijo que no había problema.** Testificó que, limpió a la paciente con unos "*chubbs"* en el área genital, le colocó el pañal y, luego el "*panty*", **como ella le solicitó** y encima, el pantalón que

---

[17] Íd., minutos 16:00 a 20:00.
[18] Íd.
[19] Íd.
[20] Íd.
[21] Íd.
[22] Íd.
[23] Íd.
[24] Íd.
[25] Íd.
[26] Íd.
[27] Íd.

llevaba puesto. Indicó que, le puso una sábana de papel y movió a la paciente al área de intermedio, donde estaba su otra compañera, la enfermera Encarnación Soliman.[28] Reiteró que, **la paciente estaba despierta, tranquila y cooperadora.** Especificó que, ubicó a la recurrida en el cubículo I-9.[29] Indicó que esa área del hospital tiene múltiples pasillos y cubículos que están divididos por cortinas.[30] Explicó que cada cubículo tiene una camilla y una silla.[31] Sostuvo que la duración de la paciente en el área de "*triage*" fue de 20 a 30 minutos.[32]

Durante el contrainterrogatorio, la enfermera López Camacho reafirmó que lleva 7 años como enfermera y trabajando en el mismo hospital.[33] Atestiguó que, el señor Israel Báez le estaba asistiendo ese día entrando en el sistema del récord la información de los pacientes y ayudando a coger los signos vitales.[34] Declaró que del récord médico de la señora Nevárez Torres no surge que ella hubiese tenido interacción con esta paciente.[35] Indicó que ella fue la que le hizo el "*triage*" a la señora Nevárez Torres.[36] Destacó que ella estuvo en el hospital hasta las 7:00 a.m. del 21 de noviembre de 2021. Mencionó que conversó con la enfermera Encarnación Soliman sobre la señora Nevárez Torres.[37] La defensa le preguntó a la testigo sobre quién provee la información de que la paciente tuvo un accidente y respondió que, en este caso, los paramédicos en el área de registro dicen por qué viene el paciente.[38] A preguntas de la Defensa, la testigo respondió que, para ella realizarle el "*triage*" a la paciente, no tiene que examinar el reporte del paramédico.[39]

---

[28] Íd., minutos 21:41 a 25:00.
[29] Íd.
[30] Íd.
[31] Íd.
[32] Íd.
[33] Íd., minutos 26:07 a 34:38.
[34] Íd.
[35] Íd.
[36] Íd.
[37] Íd.
[38] Íd., minutos 45:00 a 50:00.
[39] Íd., minutos 50:00 a 56:19.

Sostuvo que ella nunca le dijo a la enfermera Encarnación Soliman que la señora Nevárez Torres estuviera desorientada. Asimismo, declaró que el señor Israel Báez tampoco dijo en altavoz que la señora Nevárez Torres estuviera desorientada.[40]  En el re directo, la enfermera Camacho aclaró que su nombre no se reflejaba en el récord de la paciente Nevárez Torres porque quien entró los datos fue el señor Israel Báez.[41]

### *Agente Oquendo Torres*

El agente Benedicto Oquendo Torres declaró que es agente de la Policía de Puerto Rico desde hace 34 años y que pertenece a la División de Patrullaje en Carretera.[42]  Está adscrito a la División de Patrullas de Utuado hace 22 años. Relató que es patrullero, motociclista, orientador e investigador de accidentes de tránsito. Explicó que, como parte de sus funciones, hace patrullaje, orienta e investiga choques leves, graves y fatales.[43]  Indicó que, con relación a los accidentes fatales, investiga y consulta con el fiscal si es fatal, si hay que hacer toma de muestra de sangre para alcohol, o muestra de aliento para detectar alcohol, entre otras situaciones.[44]  Explicó que su función consiste en llevar a la persona a la toma de muestra de sangre o aliento para determinar si la persona está conduciendo un vehículo de motor bajo los efectos de bebidas embriagantes.[45] Destacó que ha tomado adiestramientos sobre la investigación de accidentes fatales y sobre de la operación de la máquina de alcohol 5000.[46]

A preguntas del Fiscal sobre qué sucedió el 20 de noviembre de 2021, el Agente Oquendo Torres atestiguó estaba de turno a las

---

[40] Íd.
[41] Íd., minutos 56.20 a 1:00:00.
[42] Íd., minutos 1:10:00 a 1:15:00.
[43] Íd.
[44] Íd.
[45] Íd.
[46] Íd.

4:00 p.m. hasta 4:00 a.m.[47]  Declaró que ese día se encontraba asignado a un patrullaje especial de tránsito en el área de Río Piedras en la Carretera #1 para investigar unas carreras clandestinas.[48] Indicó que, aproximadamente entre las 2:00 a.m. y 3:00 a.m., recibió una llamada de su supervisor, el Sargento Agner Camacho (Sargento Camacho) para que pasara al puente Teodoro Moscoso a brindar cooperación.[49]  Mencionó que se dirigió al lugar junto con el Agente Ángel Rosado Medina y un grupo de alrededor 4 a 5 patrullas adicionales para dar cooperación en el área.[50]  Narró que, al llegar al puente Teodoro Moscoso, el Sargento Camacho le indicó que pasara a la División de Patrullas y Carreteras de San Juan para que recogiera un envase para tomarle una muestra de sangre a la conductora de uno de los vehículos involucrados en el accidente. Le indicó que era la señora Mayra Nevárez Torres, y que preguntara por ella en el Hospital de Área de Carolina.[51]  Mencionó que, luego de recibir esa información, se dirigió a la División de Patrullas de San Juan, donde recogió el envase y verificó que no estuviera expirado.  Explicó que el envase tiene en un sello blanco en la parte de abajo que tiene una dirección pre dirigida que va al Departamento de Salud.  Verificó que el envase 21-0459 no estuviera expirado porque si estaba expirado, no podía llevarlo para que la enfermera lo utilizara; tendría que cambiarlo por otro que no estuviera expirado.[52]

El Agente Oquendo Torres testificó que luego, se dirigió al Hospital UPR de Carolina, y que cuando llegó, se dirigió al área de Sala del Emergencias.[53]   Indicó que allí estaba el guardia de seguridad en el "*lobby*" y le preguntó "si habían traído a una paciente

---

[47] Íd., minutos 1:15:00 a 1:20:00.
[48] Íd.
[49] Íd.
[50] Íd.
[51] Íd.
[52] Íd.
[53] Íd.

de nombre Mayra Nevárez y este [l]e indicó que había llegado una ambulancia con una paciente de un accidente y que le iba a llevar hasta el *counter* de enfermería".[54]   Manifestó que, este lo llevó al *counter* de enfermería donde estaban la enfermera Encarnación Soliman y la enfermera Acevedo Nazario.  Se identificó y les indicó a estas últimas y les dijo que estaba buscando a la señora "Mayra Nevárez", y estas le indicaron que esta estaba en unos de los cubículos que ellos tienen dentro del hospital y lo llevaron a donde ella.[55] Le enseñaron que era la dama, a la cual identificó como "la dama aquí presente", con *sweater* blanco y camisa azul.[56]  Testificó, que esa persona era la señora Nevárez Torres y la identificó en sala.[57]

Añadió que, al ser llevado al cubículo donde estaba la señora Nevárez Torres, se dirigió hacia donde ella.[58]  Describió que esta estaba semisentada en la camilla, y que, al conversar con ella, esta de momento se reía y después se ponía seria.[59] Indicó que, expedía fuerte olor a alcohol.[60] Declaró que él se identificó con ella y le preguntó si ella era Mayra Nevárez y ella le respondió que sí, y le indicó que era el agente Oquendo y que había sido enviado por su supervisor para que la enfermera le realizara una muestra de sangre.[61]  Sostuvo que, en efecto, por su observación, se veía que había consumido alcohol".[62]  Según declaró, esta tenía fuerte olor a alcohol, tenía los ojos rojizos, estaba sudorosa y mostraba un patrón que se reía y luego se abstenía y por esa observación, entendía que sí, que había consumido alcohol durante la noche.[63]

Testificó el agente Oquendo Torres que llegó al hospital aproximadamente como a las 4:10 de la madrugada.  Atestiguó que,

---

[54] Íd., minutos 1:20:00 a 1:25:00.
[55] Íd.
[56] Íd.
[57] Íd.
[58] Íd.
[59] Íd.
[60] Íd.
[61] Íd.
[62] Íd.
[63] Íd.

una vez lo llevaron hacia la señora Mayra Nevárez, observó los elementos (que se reía y después se ponía seria, que expedía fuerte olor a alcohol, ojos rojizos), entonces, le leyó las advertencias a esta. Tomó el documento y procedió a explicarle "paso a paso" el proceso al cual se iba a enfrentar ella y los derechos que ella tiene.[64] Mencionó que, le explicó que si se negaba iba a tener que ir a donde un fiscal para que fuera al tribunal a buscar una orden".[65] Indicó que, tras explicarle advertencias, la señora Nevárez Torres le indicó que entendía lo explicado y que iba a cooperar, pero que no iba a firmar el documento".[66]

Indicó que mientras le comunicó esto a la señora Nevárez Torres, estaban junto a él los enfermeros Encarnación Soliman, Acevedo Nazario y Rivera Delgado.[67] Mencionó que este último quería observar el proceso para aprender y por eso, se mantuvo por el lugar.[68] Declaró que supo que Mayra entendió lo explicado en las advertencias porque interactuó con ella y [...] dijo que entendía, que iba a cooperar, pero que no iba a firmar el documento".[69] Narró el testigo que, las advertencias que le hizo a la señora Nevárez Torres fueron las que son para las personas sospechosas de hacer funcionar o manejar un vehículo de motor bajo aparente estado de embriaguez o sustancias controladas.[70] Narró que, tomó el documento y se lo leyó y explicó cada una de las advertencias.[71] Especificó que le indicó que de "negarse tenía que llamar a un fiscal para que se expidiera una orden judicial para hacerle una prueba y de negarse, con la orden estaría cometiendo un desacato".[72] Declaró que, de ver el documento de las advertencias que le leyó lo

---

[64] Íd.
[65] Íd.
[66] Íd.
[67] Íd., minutos 1:25:00 a 1:30:00.
[68] Íd.
[69] Íd.
[70] Íd.
[71] Íd.
[72] Íd.

reconocería porque tiene su firma y letra. El documento se marcó el documento de las advertencias como el *Exhibit* #2 del Ministerio Público sin objeción de la defensa.[73]

A preguntas del Fiscal, el agente leyó detalladamente el contenido de las advertencias contenidas en el *Exhibit* #2 del Ministerio Público. Señaló que, tiene su nombre y su firma (del agente) y las 4:32 de la mañana. El agente narró que él escribió el nombre de la señora Nevárez en el encasillado de la firma y puso al lado que esta le indicó que no iba a firmar.[74] No hay ninguna otra firma de testigo. Aclaró que escribió en dicho encasillado porque le explicó a la dama y ella le indicó que entendía, pero no quiso firmar el documento.[75] Indicó que concluyó que la señora Nevárez Torres entendía porque mientras le hizo las advertencias, ella estaba atenta, escuchándolo, se mantuvo en silencio, y al culminar le manifestó que entendía, pero que no iba a firmar el documento.[76]

Sostuvo que, en ese momento, le entregó el envase a la señora Encarnación Soliman y que esta última le dijo que se iba encargar de tomar la muestra de sangre.[77] Detalló que le entregó el envase cerrado y sellado con un *tape* rojo.[78] Sostuvo que una vez le entregó el envase a la enfermera, cuando la enfermera Encarnación Soliman comenzó a tomar la muestra, él se ubicó al final de la camilla.[79] Explicó el agente Oquendo que, cuando le entregó el envase para la muestra, en el área de la camilla estaban las enfermeras Encarnación Soliman, Acevedo Nazario y otro enfermero que pidió estar presente para observar el proceso, de nombre Xavier, pero no recordaba el apellido.

---

[73] Íd.
[74] Íd.
[75] Íd.
[76] Íd.
[77] Íd.
[78] Íd., minutos 1:35:00 a 1:40:00.
[79] Íd.

Indicó que, cuando le explicó las advertencias a la señora Nevárez Torres, estaban los tres enfermeros, Gina (Encarnación Soliman), Acevedo Nazario y Xavier. Ellos estaban al final de la camilla y él en el cubículo hablando con la dama, refiriéndose a Nevárez Torres.[80]

Especificó, que la señora Nevárez estaba sentada en la camilla.[81] Explicó que cuando él le entregó el envase a la enfermera Encarnación Soliman, esta lo abrió y continuó con el procedimiento de la muestra. Además, expresó que la enfermera Encarnación Soliman le explicó el proceso que le iba a hacer a la señora Nevárez.[82] Mencionó que observó cuando la enfermera Encarnación Soliman abrió el envase, sacó el contenido del parte de remisión y los envases y procedió a tomar la muestra. Detalló que la enfermera tomó tres muestras.[83] Declaró que, en ese momento, él se encontraba frente a la camilla, al final del cubículo.[84]

A preguntas sobre cómo la enfermera Encarnación Soliman tomó la muestra a la señora Nevárez Torres, el agente Oquendo Torres narró que ella primero intentó tomar la muestra en el brazo izquierdo, y que, como tuvo problemas para encontrar la vena, se movieron al brazo derecho.[85] Allí, ella utilizó el *Betadine* que estaba dentro del envase para limpiar, le puso el torniquete y le introdujo la aguja para extraerle la sangre.[86]

Respecto al comportamiento de la señora Mayra Nevárez durante la extracción de sangre, el agente Oquendo indicó que ella estaba **cooperadora**, y que **nunca se negó a que le tomaran la**

---

[80] Íd.
[81] Íd.
[82] Íd.
[83] Íd.
[84] Íd.
[85] Íd. minutos 1:40:00 a 1:50:00.
[86] Íd.

**muestra.** Añadió que, la señora Nevárez **en ninguna ocasión le arrancó el brazo de las manos a la enfermera.**[87]

El testigo declaró que, luego de la extracción de sangre, la enfermera Encarnación Soliman le explicó a la dama que le iba a entregar un envase con una muestra para que ella la llevara a algún laboratorio de su preferencia si no estaba de acuerdo.[88] Indicó que, la enfermera Encarnación Soliman llenó el papel de la parte de remisión de las muestras que iba a enviar al Departamento de Salud.[89] Añadió que, observó cuando la señora Nevárez Torres firmó el documento del parte de remisión.[90] Indicó que, una vez le entregan el tubo de sangre, y ella firma el parte de remisión, la enfermera Encarnación Soliman le entregó copia del parte de remisión, y depositó dentro del frasco, las dos muestras restantes junto con el parte de remisión que había llenado y firmado y cerró el frasco con el *tape* de evidencia que va para el Departamento de Salud.[91] La enfermera Encarnación Soliman le entregó la copia de él, y guardó la copia de ella.

Acotó el testigo que él depositó el frasco sellado en el buzón del correo postal ubicado frente al edificio de UBS de la Avenida Muñoz Rivera.[92] Declaró que, de su investigación, el resultado de la prueba arrojó que la señora Nevárez Torres tenía .29 % de alcohol en la sangre.[93] *(Exhibit #3).* El agente Oquendo Torres manifestó que

---

[87] Íd.

[88] Íd.

[89] Íd.

[90] Íd.

[91] Íd.

[92] Íd.

[93] En ese momento, el Ministerio Público solicitó que se admitieran los resultados de los análisis como evidencia bajo la Regla 902 (B) de las Reglas Evidencia, 32 LPRA Ap. VI, ya que estaba certificado y firmado por un funcionario del Departamento de Salud y con el sello del Estado Libre Asociado de Puerto Rico. Por su parte, la defensa de la recurrida objetó su contenido por ser prueba de referencia. Luego de argumentado por las partes respecto a la objeción de la Defensa, el foro *a quo* determinó que el documento quedó autenticado por la Regla 902 (B) de las Reglas de Evidencia, *supra*, y se marcó el mismo como *Exhibit* #3. Determinó la Juzgadora de instancia que, el documento fue autenticado y que su contenido estaba condicionado y sujeto al contrainterrogatorio de la persona que preparó el documento.

vio el documento anteriormente en la Fiscalía, donde se enteró del resultado.[94]

En el contrainterrogatorio, la Defensa le cuestionó al agente Oquendo Torres, las razones por las cuales, según su declaración jurada, el Sargento Camacho le indicó recoger la muestra con una numeración en particular, el número 21-0459.[95] A lo que el testigo respondió que desconocía las razones para ello.[96] Se le preguntó si había cuestionado al Sargento Camacho sobre el porqué le instruyo recoger un envase en particular, a lo cual contestó en la negativa.[97]

Indicó que, recogió el kit número 21-0459.[98] Expresó que en la vista preliminar ni en la declaración jurada mencionó que el señor Rivera Delgado estuvo en el proceso de la toma de la muestra de sangre.[99] Indicó que hoy, refiriéndose al día de la vista, era la primera vez que declaraba que el señor Rivera Delgado estuvo presente.[100] Se le preguntó sobre si la Fiscalía se lo recordó, a lo indicó que sí.[101] La Defensa le preguntó, además, si los fiscales le pidieron que mencionaran a otra persona y respondió que "no".[102]

El agente Oquendo Torres reconoció que no tenía una orden judicial para tomar la muestra de sangre a la señora Nevárez Torres.[103] Se le cuestionó si fue a buscar el envase con la intención de sacar la muestra de sangre.[104] Este respondió que no, porque él tenía que hacer otras observaciones adicionales.[105] Además, indicó que no se le instruyó por el Sargento Camacho a extraer la sangre.[106]

---

[94] Regrabación de la vista del 28 de octubre de 2022; minutos del 28 de octubre de 2022, minutos 1:50:00 al 1:54:00.
[95] Íd.
[96] Íd.
[97] Íd., minutos 2:01.00 a 2:07:00.
[98] Íd.
[99] Íd.
[100] Íd.
[101] Íd.
[102] Íd.
[103] Íd., minutos 2:20:00 a 2:25:00.
[104] Íd.
[105] Íd.
[106] Íd.

Aclaró el Agente Oquendo que él estuvo presente en la escena del choque vehicular.[107]

Manifestó que de su declaración jurada surge que la señora Nevárez Torres era sospechosa de guiar un vehículo de motor, pero indicó inicialmente que él nunca la vio conducir un vehículo de motor.[108] A preguntas de la Defensa, indicó que el Sargento Camacho no le transfirió los motivos fundados.[109] Mencionó que a él no le constaba de propio conocimiento que la señora Nevárez Torres estuviese conduciendo un vehículo de motor.[110]

La Defensa procedió a mostrarle el *Exhibit* #2 al agente Oquendo Torres, luego de lo cual, este leyó la primera oración y se le cuestionó si eso no era correcto.[111] El testigo no respondió, toda vez que, el Tribunal decretó un receso hasta el día siguiente debido a una situación de emergencia informada en la sala.[112]

### Vista del 29 de noviembre de 2022[113]

#### *Agente Oquendo Torres*

El 29 de noviembre de 2022 culminó el examen directo del Agente Oquendo Torres, así como su contrainterrogatorio.[114] El agente Oquendo declaró que él no vio a la recurrida conducir un vehículo de motor ese día, ni la vio involucrada en un accidente de vehículo de motor.[115] Indicó que él le hizo las advertencias de ley cuando la vio en la camilla bajo los efectos del alcohol.[116] Afirmó que, aunque él no la vio, esos motivos fundados se los transmitieron a él. Relató que el Sargento Camacho le dijo a él que pasara por el

---

[107] Íd., minutos 2:25:00 a 2:30:00.
[108] Íd.
[109] Íd., minutos 2:27:18 a 2:32:32.
[110] Íd., minutos 2:32:31 a 2:33:59.
[111] Íd.
[112] El agente Oquendo Torres continuó su testimonio el 29 de noviembre de 2022, según se expone más adelante.
[113] Regrabación del 29 de noviembre de 2022; y *Minuta* del 29 de noviembre de 2022.
[114] Regrabación del 29 de noviembre de 2022.
[115] Íd., minutos 5:54 a 13:00.
[116] Íd.

Teodoro Moscoso a brindar apoyo de un accidente fatal.[117]  Indicó que, este también le dijo que la señora Nevárez Torres era la conductora.[118]  Aclaró que el Sargento Camacho le transfirió los motivos fundados.[119]  Entonces, se le preguntó si de acuerdo con su declaración jurada y con su testimonio en sala no se le transfirieron los motivos fundados, dijo que sí. [120]  La Defensa le inquirió al testigo sobre dónde estaban los motivos fundados transferidos, a lo que este respondió que, ella era la conductora y cuando yo llego al hospital la observó y ahí es que están los motivos fundados.[121]

Al ser interrogado sobre si él le indicó a la señora Nevárez Torres que ella podía negarse a que le realizaran la prueba, este aseveró que se lo dijo en las advertencias que dicen que de usted negarse [...], y que se lo advirtió con las advertencias.[122]

Respecto a las marcas que hizo el testigo que surgen del *Exhibit* #2 del Ministerio Público, indicó que las hizo, ya que la señora Nevárez Torres se negó a firmar las advertencias.  Especificó que, escribió el nombre de la señora Nevárez Torres, pero que eso no es una firma, sino que, escribió su nombre y le escribió "se negó".[123] Mencionó que no le hizo las advertencias Miranda a la señora Nevárez Torres.[124] En cuanto al tiempo que le tomó la lectura de las advertencias, indicó que, le tomó como un minuto y que eso fue a las 4:32 a.m.[125]  Añadió que, cuando le leyó las advertencias no se le había tomado la muestra de sangre.[126]  Más adelante, mencionó que en su testimonio en sala no había mencionado que la señora Encarnación Soliman le hubiese preguntado el nombre de la señora

---

[117] Íd.
[118] Íd.
[119] Id., minutos 13:01 a 15:00.
[120] Íd., minutos 16:49 a 19:49.
[121] Íd., minutos 19:50 a 21:25.
[122] Íd., minutos 21:26 a 25:00.
[123] Íd., minutos 25:26 a 30:00.
[124] Íd., minutos 30:00 a 35:00.
[125] Íd., minutos 39:28 a 45:00.
[126] Íd.

Nevárez Torres en su presencia.[127] Igualmente, expresó que esta nunca le preguntó a la señora Nevárez Torres en su presencia si ella había tenido un accidente.[128] El agente Oquendo reiteró que, él verificó la fecha expiración del envase, y que como vio que no estaba expirado, se llevó el mismo.[129] Asimismo, afirmó que vio cuando la señora Nevárez Torres firmó el parte remisión.[130]

En el examen redirecto, indicó que él le leyó las advertencias de ley, aun cuando no la vio conduciendo un vehículo de motor, porque "su supervisor [l]e indicó que pasara al hospital porque ella era la conductora de un vehículo Hyundai que estaba envuelta en un accidente de carro en el Teodoro Moscoso".[131] Añadió que, su supervisor le indicó a él que pasara por el hospital y preguntara por la conductora de un vehículo Hyundai para hacerle la prueba de sangre, ya que señora Nevárez Torres había estado envuelta en un choque en el Teodoro Moscoso. Declaró que, en adición a eso, tuvo sus propias observaciones, de que esa persona se encontraba en aparente estado de embriaguez.[132] Atestiguó que, la señora Nevárez Torres expedía fuerte olor a alcohol, tenía los ojos rojizos, se ría y se quedaba seria. Indicó que, tenía una sintomatología que le daba entender a él que ella estaba bajo los efectos del alcohol.[133]

Con relación al *Exhibit* #2 del Ministerio Público, el agente Oquendo aclaró que él marcó la parte que dice que la señora Nevárez Torres debido a que ella le indicó que iba a cooperar, pero que no iba a firmar ningún documento.[134] Sostuvo que, puso su nombre para poder identificar en el documento que él le había hecho esas advertencias a doña Mayra.[135] El testigo declaró que, la señora

---

[127] Íd., minutos 50:00 a 55:00.
[128] Íd.
[129] Íd., minutos 53:00 a 55:00.
[130] Íd., minutos 55:00 a 1:05:00.
[131] Íd., minutos 1:08:00 a 1:11:00.
[132] Íd.
[133] Íd.
[134] Íd.
[135] Íd.

Nevárez Torres fue cooperadora aunque se negó a firmar, ya que cuando le fue explicando, ella le decía que entendía, pero que no le iba a firmar a él".[136]

**Vista del 9 de noviembre de 2022[137]**

*Enfermera Gina Sofía Encarnación Soliman*

La enfermera Encarnación Soliman (en adelante enfermera Encarnación o Gina) testificó que es enfermera graduada y que trabaja en la Sala de Emergencias del Hospital UPR Carolina desde noviembre de 2012.[138] Manifestó que sus funciones allí son realizar *triage*, canalizar pacientes y tomar muestras.[139] Indicó que su horario de trabajo, desde hacía aproximadamente un año, era de 7:00 p.m. a 7:00 a.m. Aclaró que, ese era su horario para el turno del 20 de noviembre de 2021.[140]

A preguntas del Ministerio Público, Encarnación Soliman indicó que, para el 20 de noviembre de 2021, trabajaba en la Sala de Emergencia del Hospital UPR, Federico Trilla, en el turno de la noche, de 7pm a 7am. Ese día, ella tomó una muestra de sangre, ya que el agente Oquendo Torres se le acercó y dijo que tenía que tomarle una muestra de sangre a una fémina, a quien luego identificó como Mayra Nevárez Torres.[141] Declaró que, el agente Oquendo Torres le indicó que la toma de muestra de sangre se debía a un accidente vehicular y que la persona involucrada era la señora "Mayra Nevárez Torres".[142] Indicó que, ese día cuando se le acercó el agente Oquendo Torres, la Sala de Emergencias estaba "manejable".[143]

---

[136] Íd., minutos 1:11:00 a 1:13:56.
[137] Regrabación de la vista del 9 de noviembre de 2022; y *Minuta* de la vista del 9 de noviembre de 2023.
[138] Regrabación de la vista del 9 de noviembre de 2022, minutos 1:55 a 5:00.
[139] Íd.
[140] Íd.
[141] Íd., minutos 6:14 a 10:00.
[142] Íd., minuto 10:00 a 15:00.
[143] Íd.

La enfermera Encarnación Soliman declaró que, luego, procedió a llevar al agente Oquendo a donde la paciente, quien estaba ubicaba en el cubículo I-9.[144] Una vez llegó al cubículo I9, procedió a preguntarle a la paciente su nombre, a lo que esta respondió: "Mayra".[145] Destacó que, ella también verificó la banda de identificación de la paciente que decía su nombre.[146] Acto seguido, procedió a preguntarle la fecha nacimiento, dónde estaba y la orientó sobre la muestra de sangre que tenía que tomarle para conocer el nivel del alcohol en la sangre.[147] Sostuvo que, la señora Nevárez Torres le contestó su edad, le dijo que estaba en el hospital, y que "**no había ningún problema**" para la toma de la muestra de sangre.[148] Atestiguó que, cuando ella le hizo esas preguntas a la paciente Nevárez Torres, estaban allí el agente Oquendo Torres, y los enfermeros Acevedo Nazario y Rivera Delgado.[149] Mencionó que el enfermero Rivera Delgado estaba ahí porque le había pedido que cuando surgieran procedimientos que él no había hecho, que le orientara para él aprender.[150]

Acto seguido, identificó a la señora Nevárez Torres en sala como la persona a quien le tomó la muestra.[151] La testigo declaró que, le hizo varias preguntas a la paciente y luego procedió a la toma de la muestra de sangre.[152] Narró que comenzó a tomar la muestra con el brazo izquierdo de la señora Nevárez Torres y como no vio vena, procedió a tomar la muestra en el brazo derecho.[153] Según su testimonio vertido en Corte, la enfermera Encarnación Soliman le tomó la muestra de sangre a la señora Nevárez Torres con el kit de la prueba de alcohol que le entregó el agente Oquendo Torres.

---

[144] Íd.
[145] Íd.
[146] Íd.
[147] Íd.
[148] Íd. Énfasis suplido.
[149] Íd.
[150] Íd.
[151] Íd.
[152] Íd., minutos 16:00 en adelante.
[153] Íd.

Detalló que el kit contenía lo siguiente: (1) un papel con instrucciones del procedimiento a llevar; (2) un sobre *bioharzard;* (3) yodo; (4) tres tubos con tapas de color gris y con el mismo número; (5) pote; (6) sello de seguridad para sellar el pote; (7) kit de la muestra; (8) documento de la parte de remisión.[154] Puntualizó que, ese kit se le entregó sellado.[155] Especificó que, mientras ella abría el kit, el agente Oquendo Torres se encontraba en el área del cabezal hablando con la señora Nevárez Torres.[156] Manifestó que no escuchó lo que estaban dialogando.[157] Expresó que el proceso de la toma de muestra consistió en hacerle un torniquete en el brazo derecho a la recurrida, limpiar el área con *Betadine* y proceder a tomar la muestra.[158]

Sostuvo que, al tomar la muestra, el agente Oquendo Torres se encontraba al pie de la camilla, mientras que la señora Acevedo Nazario y ella se encontraban a lado de la camilla.[159] Manifestó que el señor Rivera Delgado se quedó más atrás que el agente Oquendo Torres.[160] Declaró que, una vez tomó la muestra, tomó el documento de remisión del kit y le preguntó a la señora Nevárez Torres la dirección y lugar de empleo.[161] Aseveró que esta le contestó todo. Además, indicó que, de ver el documento de la parte de remisión, lo reconocería, ya que ella lo llenó y lo firmó.[162] *(Exhibit #5).*

Mencionó que, mientras ella le tomó la muestra a la señora Nevárez Torres, **esta se encontraba en la camilla, en una posición semisentada**.[163] La testigo acotó que, del *Exhibit #5* surge: que el número de la muestra de sangre era el 21-0459*;* el nombre de la paciente "Nevárez Torres Mayra E."; que la persona que tomó la

---

[154] Íd.
[155] Íd., minutos 17:00 en adelante.
[156] Íd.
[157] Íd.
[158] Íd., minutos 18:55 a 22:24.
[159] Íd.
[160] Íd.
[161] Íd.
[162] Íd., minutos 22:24 a 25:00.
[163] Íd., minutos 25:00 a 30:00.

muestra era ella, la hora de la toma fue las 4:33 a.m.; y que se tomó en el hospital de Área de Carolina Federico Trilla. Añadió que, el documento fue firmado por la enfermera Acevedo Nazario, la señora Nevárez Torres y ella. Declaró que, tras la extracción de sangre, la señora Nevárez Torres le dio su información para poder llenar el documento de remisión.[164] Reiteró que esta le indicó "el nombre, edad, dirección, lugar de trabajo".[165] Aseveró la testigo que, ella le explicó que le iba a entregar una de las muestras y que ella podía llevar esa muestra a su laboratorio de preferencia, y que las otras muestras se iban a enviar al Departamento de Salud.[166] Aseguró que, los tubos de las otras muestras nunca salieron de su mano y que los echó en la bolsa *biohazard* que trae el kit, llenó la información, y selló el envase.[167] **Afirmó que, durante todo el proceso la recurrida se comportó "tranquila" y "cooperadora".**[168] **A preguntas sobre el comportamiento de la señora Nevárez Torres, y si esta se había negado a que le tomaran la muestra, la testigo declaró que esta nunca se negó a la muestra.**[169] Indicó que, ella cerró el envase de la muestra con una tapa metálica que trae. Señaló que, el sello es uno muy fino y que el agente Oquendo Torres la ayudó para que no se rompiera. Añadió que, una vez sellado el envase de la muestra, se lo entregó al agente.[170] Recalcó que durante la toma de la muestra de sangre la señora Nevárez Torres estuvo tranquila todo el tiempo y no se negó a que le tomaran la muestra.[171]

Durante el contrainterrogatorio, la enfermera Encarnación Soliman manifestó que, antes de que llegara el agente Oquendo

---

[164] Íd.
[165] Íd.
[166] Íd.
[167] Íd.
[168] Íd.
[169] Íd., minutos 30:00 a 34:36.
[170] Íd.
[171] Íd.

Torres, la enfermera López Camacho ya le había hablado de la señora Nevárez Torres.[172] Afirmó que, López Camacho había pasado a la señora Nevárez Torres al cubículo I-9.[173] Indicó no recordar que le hayan dicho que la señora Nevárez Torres estuviera desorientada.[174] A preguntas de la Defensa, manifestó que del diálogo entre Camacho y Báez, oyó que la señora Nevárez Torres estaba desorientada.[175] Afirmó que escuchó que la señora Nevárez Torres se había negado a que le quitaran el *"panty"*.[176] Se le preguntó si en la declaración jurada, ella indicó que la señora Nevárez Torres tenía la voz pesada y hablaba lento, y que si ello era cónsono con estar desorientada, y esta respondió que no. La Defensa le preguntó a la testigo que si el hecho de que viera a la señora Mayra Enid Nevárez Torres que estaba hablando lento y con la voz pesada, era cónsono con lo que ella escuchó de que Doña Mayra estaba desorientada. La testigo respondió que no. Afirmó que, para ella, podía estar hablando lento y pesado sin estar desorientada. Luego, la Defensa le preguntó si de acuerdo a lo que ella escuchó y observó, tenía las tres cosas, desorientada, hablaba lento y … En ese momento, la pregunta fue objetada por el Ministerio Pública y la objeción fue declarada Ha Lugar.[177]

Respecto a los eventos del 21 de noviembre de 2020, la Defensa le preguntó a la testigo si había declarado que vio que el agente Oquendo tenía el pote, el cual es marrón, con tapa plateada y con el número 210459. Posteriormente, la Defensa le cuestionó a la testigo si de la declaración jurada que esta prestó, no surgía que ella hubiese inspeccionado el kit, a lo que la testigo respondió en la negativa. La Defensa le cuestionó si, por tanto, no había manera de

---

[172] Íd. minutos, 40:00 a 45:00.
[173] Íd.
[174] Íd., minutos 45:00 a 50:00.
[175] Íd.
[176] Íd.
[177] En ese momento hubo un receso del tribunal porque la testigo se sintió indispuesta.

que ella supiera el número de identificación. [178]  Esta declaró que el número aparece arriba. Se le preguntó nuevamente si había inspeccionado el kit, a lo que respondió que sí, que lo vio.[179]

Sobre el orden en que llevó a cabo el procedimiento, la testigo declaró que ella tomó la muestra de sangre y luego llenó el parte de remisión.[180]  Al ser cuestionada, respondió que, según lo que había indicado en su declaración jurada, ella llenó primero el parte de remisión y después tomó la muestra de sangre.[181]  Sin embargo, luego aclaró que, primero tomó la prueba y después completó el referido documento.[182]

Por otro lado, a preguntas de la Defensa, indicó que **para ella era importante destacar que la paciente estaba cooperadora, ya que, si esta se rehusaba, ella no le tomaba la muestra.**[183]  **Reiteró que, la señora Nevárez Torres estuvo cooperadora porque de lo contrario, ella no le hacía la prueba**.[184]  Manifestó que no tenía una orden judicial y que no recordaba si al momento en que le hizo la muestra, en el récord había orden médica.[185] Al preguntársele si el pote expiraba por mes o por año, testificó que no tenía respuesta.[186] Indicó que, el pote de la muestra de sangre que tomó expiraba en el año 2021.[187]

Más adelante, indicó que, para llevar a cabo la extracción de sangre, utilizó las instrucciones del kit y no utilizó el Reglamento Núm. 9234.[188] Especificó que, en el *Exhibit #5* no surge expresamente el tipo de muestra, pero que marcó la muestra de sangre.[189]  Sostuvo que, en el parte de remisión no colocó el nombre

---

[178] Íd., minutos 56:15 a 1:00:00.
[179] Íd., minutos 1:05:00 a 1:10:00.
[180] Íd., minutos 1:15:00 a 1:25:00.
[181] Íd.
[182] Íd.
[183] Íd.
[184] Íd.
[185] Íd., minutos 1:28:24 a 1:36:24.
[186]  Íd., minutos 1:36:24 a 1:39:00.
[187] Íd., minutos 1:36:25 a 1:40:00.
[188] Íd., minutos 1:40:00 a 1:45:00.
[189] Íd.

del tribunal donde iba a radicar el caso, ni llenó la partes de las observaciones de la intervenida, ni el dato de la licencia de conducir.[190] Adujo que, colocó en el nombre del Sargento Camacho como agente interventor, porque así se lo indicó el agente Oquendo Torres.[191] Indicó que la señora Acevedo Nazario, la señora Nevárez Torres y ella firmaron el documento del parte remisión.[192] Especificó que esta última firmó el documento semisentada en la camilla.[193] Aclaró que, la señora Nevárez Torres escribió su nombre en el parte de remisión y firmó donde dice firma del paciente.[194] Admitió que en la declaración jurada ni en la vista preliminar mencionó al señor Rivera Delgado, y que lo mencionó por primera vez en esa vista.[195]

En el examen re-directo, la enfermera Encarnación Soliman aclaró que no había mencionado al señor Rivera Delgado anteriormente porque no lo recordó.[196] Explicó que no lo recordó porque él no tuvo participación directa en la toma de muestra; y que estaba allí observando solamente.[197] La testigo declaró que ha tomado anteriormente muestras para verificar el nivel de alcohol en la sangre, aunque no tiene el número exacto.[198] Aclaró que en el parte de re remisión escribió el nombre del Sargento Abner Camacho como agente interventor, porque el agente Oquendo Torres le explicó que el agente interventor lo era el Sargento Abner Camacho.[199] Indicó que, aunque nunca había mencionado dónde se apoyó la señora Nevárez Torres para firmar, "esta lo hizo en una tablita que

---

[190] Íd.
[191] Íd.
[192] Íd.
[193] Íd.
[194] Id, minutos 1:45:00 a 1:50:00. El Tribunal decretó un breve receso en la vista tras una discusión, ya que la copia que se le dio a la defensa del *Exhibit #5* tenía unas notas en tinta azul. (Íd., minutos 1:50 a 2:05:00). La testigo declaró en sala que esas notas no fueron hechas por ella y que no estaban al momento en que preparó el documento de la Parte Remisión, y que ella no sabe lo que significan esas notas. Íd., minutos 2:05:00 a 2:11:00.
[195] Íd., minutos 2:15:00 a 2:20:00.
[196] Íd., minutos 2:43 :20 a 2:47:00.
[197] Íd.
[198] Íd.
[199] Íd.

le buscó".[200]  A preguntas de la Defensa, sobre la fecha de expiración del kit, indicó que el número 21, lo vio en la parte de arriba del sobre del kit.[201]

Por otro lado, se le preguntó a qué se refería la testigo con cooperación y ella destacó que **la señora Nevárez Torres nunca se rehúso a ningún tipo de muestra o tratamiento con ella. Especificó que, ella "respondía a todo" y que "ella no estaba combativa"**.[202]  **Recalcó que, si ella se hubiese rehusado, no hubiese tomado la muestra**.[203]

### **Vista del 29 de noviembre de 2022**[204]

#### *Enfermera Acevedo Nazario*

El 29 de noviembre de 2022 declaró la enfermera Acevedo Nazario.  Esta testificó que estudió enfermería en el Colegio de Mayagüez y que ejerce la profesión de enfermería desde hace tres años y medio.[205]  *(Exhibit #6 del Ministerio Público).*  Indicó que entre junio o julio de 2021 comenzó a trabajar en el Hospital de UPR Carolina, específicamente, en el área de Sala de Emergencias y que sus turnos son de 12 horas.[206]  Su número de licencia y certificación de Registro es 93292. Declaró que mientras laboraba en la Sala de Emergencias del Hospital, sus funciones eran recibir, atender y proveer servicios a los pacientes, sacar muestras y dar medicamentos.[207]  Respecto a su turno de trabajo del 20 de noviembre de 2021, indicó que, fue de 7:00 p.m. a 7:00 a.m., y que ese día estaba asignada al área crítica de la Sala de Emergencias.[208] Narró que, durante ese turno, en esa área el tráfico de pacientes no era muy movido, por lo que, aproximadamente a las 4:00 a.m. del

---

[200] Íd., minutos 2:47:00 a 2:50:00.
[201] Íd.
[202] Íd., minutos 2:50:00 a 2:53:34.
[203] Íd.
[204] Anejo XXII, Regrabación del 29 de noviembre de 2022; y Anejo XXIII minuta del 29 de noviembre de 2022.
[205] Véase Anejo XXII, regrabación de 2:15 p.m., minutos 0:00 a 5:00.
[206] Íd., minutos 10:00 a 15:00.
[207] Íd.
[208] Íd.

21 de noviembre de 2021, estaba en el *counter* de enfermería tomándose un café junto con su compañera, la enfermera Encarnación Soliman.[209] Añadió que, durante ese turno estaban los enfermeros López Camacho, Rivera Delgado, Báez y Encarnación Soliman.[210]

Narró que, estando en el *counter* con la enfermera Encarnación Soliman, llegó el agente Oquendo Torres, quien les preguntó si había llegado alguien que había tenido un accidente automovilístico en el Puente Teodoro Moscoso.[211] Ella procedió a revisar en la pantalla de la computadora del Hospital y del registro surgió que, en efecto, había llegado una paciente de nombre Mayra Nevárez Torres, quien se ubicaba en el cubículo I-9.[212] Luego, el agente Oquendo Torres les mostró a ambas que tenía un kit para detectar el nivel del alcohol en la sangre de la señora Mayra Nevárez Torres.[213] Indicó que, de ahí, los tres pasaron al cubículo I9.[214] Indicó que, al llegar al cubículo, la enfermera Encarnación Soliman identificó a la paciente; le preguntó el nombre y si estuvo involucrada en un accidente de autos. **Escuchó cuando la señora Mayra Nevárez Torres respondió su nombre, y en presencia de ella y del agente Oquendo Torres, esta dijo que había estado envuelta en un accidente que ocurrió en el Teodoro Moscoso"**.[215] **Respecto a cómo percibió el estado en que se encontraba la señora Mayra Nevárez Torres, respondió que estaba "alerta en tiempo y espacio"**.[216] Añadió que, **la enfermera Encarnación Soliman también le indicó que le iba a tomar una muestra de sangre para conocer el nivel de alcohol en la sangre y le**

---

[209] Íd. minutos 15:00 a 20:00.
[210] Íd., minutos 10:00 a 15:00.
[211] Íd.
[212] Íd. minutos 15:00 a 20:00.
[213] Íd.
[214] Íd.
[215] Íd. minutos 30:00 a 35:00.
[216] Íd. minutos 25:00 a 30:00.

**preguntó si no había ningún problema.  Acotó que la señora Mayra Nevárez Torres accedió voluntariamente y expresó que "no había problema".**[217]

Relató que, el agente Oquendo Torres se le acercó a la señora Mayra Nevárez Torres a darle unas instrucciones,[218] mientras ellas dos iban a buscar una aguja y un torniquete en un carrito que estaba cerca del cubículo I-9, ya que el kit no trae esos instrumentos.[219]  Detalló que, al regresar al cubículo I-9, observó cuando la enfermera Encarnación Soliman sacó el *Betadine,* **se acercó a la** señora Mayra Nevárez Torres **y le dijo que le iba tomar una muestra de sangre, y esta estiró el brazo izquierdo,** por lo que se limpió el área, pero como no tenía vena buena en ese brazo, pasaron al derecho.[220]  Narró que, en ese momento en el área del cubículo I-9, estaban la señora Mayra Nevárez Torres, el agente Oquendo Torres, la enfermera Encarnación Soliman, el enfermero Rivera Delgado y ella.  Sostuvo que el agente Oquendo estaba al pie de la camilla, al igual que el enfermero Rivera Delgado.[221]  Sobre este último, manifestó que estaba allí para mirar el procedimiento de la toma de muestra.[222]

En cuanto al procedimiento sobre la toma de la muestra de sangre, narró que la enfermera Encarnación Soliman sacó los tres tubos del kit y el parte de remisión.[223] Indicó que, a la señora Mayra Nevárez Torres se le extrajeron tres tubos de sangre. Destacó que, **mientras se tomó la muestra la señora Mayra Nevárez Torres no dijo nada, no se quejó, simplemente estiró el brazo.**[224]  Manifestó que, luego de la extracción de sangre, la enfermera Encarnación

---

[217] Íd. minutos 20:00-25:00.
[218] Íd. minutos 35:00 a 43:53.
[219] Íd. minutos 20:00 a 25:00.
[220] Íd. minutos 25:00 a 30:00.
[221] Íd.
[222] Íd.
[223] Íd. minutos 30:00 a 35:00.
[224] Íd. minutos 25:00 a 30:00.

Soliman llenó el documento del parte de remisión con la información del sistema del hospital [...] y corroboró la información con la paciente.[225] Describió que la duración del proceso fue de 3 a *5 minutos.*[226] Expresó que el documento del parte de remisión *(Exhibit #5 del Ministerio Público)* fue firmado por la enfermera Encarnación Soliman, la señora Mayra Nevárez Torres y ella.[227] **Especificó que ella vio cuando firmó Mayra y escuchó cuando esta preguntó dónde tenía que firmar.**[228] Asimismo, indicó que, de los tres tubos de sangre, dos se colocaron en el envase del kit junto a dos hojas de la parte remisión, y el otro tubo se le entregó a la señora Mayra Nevárez Torres, junto con una hoja del parte de remisión.[229] Sostuvo que la señora Mayra Nevárez Torres tomó el tubo y lo colocó al lado de ella.[230] Continuó relatando que la enfermera Encarnación Soliman selló el envase y se lo entregó al agente Oquendo Torres, y este se lo llevó.[231]

Luego, declaró que, como a las 6:00 a.m., dio una ronda por el área de las camillas y le preguntó a la señora Nevárez Torres cómo se sentía y si se acordaba del suceso del accidente, **y que esta le respondió que no se acordaba muy bien que lo que pasó, que fue un revolú.**[232] **Luego, declaró que, la señora Mayra Nevárez Torres le preguntó por la hora, y le dijo que a las 8:00 a.m. ella se tenía que ir a trabajar porque tenía un trabajo nuevo en algo de marítima.**[233] A lo que, la enfermera Acevedo Nazario le dijo que tenía que esperar porque no la habían dado de alta.[234] Describió que, todavía a esa hora, la señora Mayra Nevárez Torres tenía los

---

[225] Íd. minutos 30:00 a 35:00.
[226] Íd.
[227] Íd., minutos 35:00 a 45:00.
[228] Íd.
[229] Íd.
[230] Íd.
[231] Íd. minutos 45:00 a 50:00.
[232] Íd.
[233] Íd.
[234] Íd.

rojizos y percibió olor a alcohol.[235] Manifestó la testigo que salió del turno de trabajo a las 7:00 a.m. y que en ese momento, la señora Mayra Nevárez Torres se encontraba en el cubículo I-9.[236] Añadió que, **la señora Nevárez Torres estuvo cooperadora en todo momento porque a todo dijo que estaba bien y cuando Gina Encarnación le dijo que le iba tomar la muestra, voluntariamente indicó que sí**.[237]

En el contrainterrogatorio mencionó que en su declaración jurada tomada el 10 de diciembre de 2021 no mencionó al señor Rivera Delgado.[238] Indicó que en el sistema del registro médico del hospital no salía que ella hubiese atendido a la señora Mayra Nevárez Torres. [239] Expresó que la enfermera Encarnación Soliman llenó el papel del parte de remisión en el *counter* de enfermería, y que se le proveyó una "tablita" a la señora Mayra Nevárez Torres para que firmara ese documento.[240] A su vez, en el redirecto, sostuvo que no mencionó al señor Rivera Delgado en su declaración jurada porque entendió que no era necesario, ya que, más allá de observar, no hizo nada en el procedimiento.[241] Recalcó que, entre el *counter* y el cubículo I-9 hay una distancia de 5 a 6 pasos, y que en ese momento, la cortina estaba abierta, y que desde ahí podían observar a la señora Mayra Nevárez Torres.[242]

### *Señor Rivera Delgado*

El señor Rivera Delgado declaró que es enfermero graduado desde el año 2018 y que desde hace 1 año y aproximadamente 6 meses, trabaja en la Sala de Emergencias del Hospital de UPR Carolina.[243] *(Exhibit #7 del Ministerio Público)*. Resumió que sus

---

[235] Íd.
[236] Íd.
[237] Íd. minutos 50:00 a 55:00.
[238] Íd. minutos 1:05:00 a 1:10:00.
[239] Íd.
[240] Íd. minutos 1:15:00 a 1:20:00.
[241] Íd. minutos 1:30:00 a 1:35:00.
[242] Íd.
[243] Íd. minutos 1:35:00 a 1:40:00.

funciones en el hospital consisten en el cuidado del paciente, la toma de vitales y administrar medicamentos, brindar cuidado paliativo, cambiar pañales y cambio de cama.[244]  Manifestó que, para el 20 de noviembre de 2021, tenía el turno de 7:00 p.m. a 7:00 a.m.[245]  Mencionó que en ese turno también estaban las enfermeras Encarnación Soliman, López Camacho, y Acevedo Nazario.[246] Especificó que esa noche le dijo a la enfermera Encarnación Soliman que quería estar presente en alguna toma de muestra de alcohol en la sangre porque no conocía el procedimiento.[247]  Posteriormente, en la madrugada, él estando en el área de pacientes en estado crítico, la enfermera Encarnación Soliman se le acercó para decirle que en el área de intermedio del hospital se iba a hacer una muestra de sangre.[248]  Esto, con el propósito de que él pudiera observar el proceso.[249]

Narró que, se movió al cubículo I-9 donde estaban la señora Nevárez Torres, el agente Oquendo Torres, las enfermeras Encarnación Soliman y Acevedo Nazario.[250]  Describió y señaló a la recurrida en sala.[251]  Declaró que, observó cuando el agente Oquendo Torres le entregó el kit a la enfermera Encarnación Soliman.[252]  Relató que, mientras esta última abría el kit, le iba explicando el proceso frente al agente Oquendo Torres, la enfermera Acevedo Nazario y la señora Mayra Nevárez Torres.[253]  **Indicó que la enfermera Encarnación Soliman también le explicó el proceso a la** señora Mayra Nevárez Torres **y que esta expresó que "no había problema".**[254]  Especificó que el proceso de la muestra de sangre

---

[244] Íd.
[245] Íd.
[246] Íd. minutos 1:40:00 a 1:45:00.
[247] Íd.
[248] Íd. minutos 1:45:00 a 1:50:00.
[249] Íd.
[250] Íd.
[251] Íd.
[252] Id.
[253] Íd. minutos 1:50:00 a 1:55:00.
[254] Íd.

duró alrededor de 3 minutos. **Indicó que la señora Nevárez Torres estuvo "cooperadora porque no presentó queja y estuvo de acuerdo en todo momento".**[255]

Detalló que en el proceso de la extracción, la enfermera Encarnación Soliman comenzó con el brazo izquierdo de la paciente, colocó el torniquete, pero como no vio área de venoculción, –explicó que esto es que no se encontró vena buena para pinchar–, se revisó el brazo derecho", y una vez vio una vena buena, limpió el área con *betadine,* introdujo la aguja y se llenaron los tres tubos.[256] Explicó que, **durante la muestra, la señora Mayra Nevárez Torres no mostró molestia ni movió el brazo.[257] Detalló que, esta dejó el brazo estirado para que le sacaran la muestra.** Indicó que, la enfermera Encarnación Soliman se quedó con los tubos y procedió a llenar la hoja del parte remisión del kit.[258] Testificó que la información del parte remisión se la proveyó la señora Nevárez Torres a la enfermera Encarnación Soliman.[259] Resaltó que, él no tuvo contacto con el documento. Sin embargo, manifestó que, observó cuando la señora Mayra Nevárez Torres firmó el documento.[260] Expresó que, durante el proceso, el agente Oquendo Torres se encontraba en el pie de la camilla.[261] Declaró que, una vez la enfermera Encarnación Soliman terminó con la documentación, selló el kit y se lo entregó al agente Oquendo Torres.[262] Añadió que, el tercer tubo de muestra, la enfermera se lo entregó a la paciente con una hoja del parte de remisión. Indicó que el proceso duró aproximadamente entre 20 a 30 minutos. Afirmó que, el parte de remisión lo firmaron cuatro personas en total: 1) la enfermera

---

[255] Íd.
[256] Íd.
[257] Íd.
[258] Íd. minutos 1:58:00 a 2:00:00.
[259] Id.
[260] Íd. minutos 2:00:00 a 2:05:00.
[261] Íd.
[262] Íd.

Encarnación Soliman; 2) la enfermera Acevedo Nazario como testigo; el Agente Oquendo Torres y la señora Mayra Nevárez Torres.

Testificó que, una vez se le entregó el kit al Agente Oquendo, culminó su parte y no volvió a esa área. Añadió que, después no tuvo más contacto con ellos.

A preguntas de la Defensa, indicó que, la primera vez que declaró esto fue en septiembre de 2022 en Fiscalía.[263] En el contrainterrogatorio mencionó que lo que declaró no lo había discutido con nadie.[264]

Finalmente, luego de evaluar los testimonios vertidos en sala, el foro de primera instancia declaró Ha Lugar la *Moción de Supresión de Evidencia* presentada por la señora Nevárez Torres y consecuentemente, suprimió la evidencia relacionada con la muestra de sangre que se le tomó.

Es un hecho incontrovertido que, conforme al derecho reseñado, la toma de muestra de sangre realizada a la señora Nevárez Torres constituyó un registro[265]. Por ende, le aplica la protección constitucional contra registros irrazonables.[266] Como regla general, será necesario obtener una orden judicial previo a efectuar un registro.[267] En el caso de epígrafe, según se desprende del testimonio del agente Oquendo Torres, no medió una orden judicial para tomar la muestra de sangre a la señora Nevárez Torres.[268] Cónsono con lo anterior, es normativa reiterada que, un registro efectuado sin mediar una orden judicial activa la presunción de que este fue irrazonable e inválido.[269] Empero, un registro sin una orden judicial previa emitida por un tribunal, por sí solo, no

---

[263] Íd. minutos 2:10:00 a 2:15:00.
[264] Íd.
[265] *Schmerber v. California,* supra, pág. 767; *Birchfield v. North Dakota,* supra, pág. 455.
[266] *Íd.*
[267] *Pueblo v. López Colón,* supra, págs. 284-285.
[268] Regrabación de la vista del 28 de octubre de 2022; minutos del 28 de octubre de 2022, minutos 2:20:00 a 2:25:00.
[269] *Pueblo v. López Colón,* supra, págs. págs. 287-288.

conlleva su inadmisibilidad.[270]    Puesto que, existen ciertas situaciones excepcionales donde no será indispensable una orden judicial previa.[271]   **Entre estas excepciones, donde no será necesaria la existencia de una orden judicial se encuentra el registro consentido voluntariamente de forma expresa o implícita (tácita)**.[272]    Pertinente al caso de epígrafe, el consentimiento implícito surge cuando "**persona obedece sin protestar al pedido de un funcionario; la persona no accede expresamente pero su acto, en un unión a un examen de la totalidad de las circunstancias, demuestra su intención de consentir el registro**".[273]

Ahora bien, un factor importante a evaluarse es la voluntariedad del consentimiento, la cual dependerá de la totalidad de las circunstancias.[274]    Es por lo que, de acuerdo a la jurisprudencia, nos corresponde llevar a cabo un minucioso examen sobre la totalidad de las circunstancias.  Por medio de este examen, se deberá tomar en cuenta las características de la persona que ha consentido al registro y el ambiente donde se llevó a cabo[275].

En primer lugar, surge de los testimonios ofrecidos en sala que, la señora Nevárez Torres en el hospital demostró tener conocimiento sobre sus datos personales como edad, dirección y empleo.  Asimismo, se encontraba ubicada en tiempo y espacio.  Según el testimonio de la enfermera López Camacho, cuando le preguntó a la parte recurrida por qué estaba en el hospital, esta respondió que se encontraba ahí como consecuencia de un accidente de tránsito.[276]   Igualmente, surge del testimonio de la enfermera Encarnación Soliman que, al preguntarle la fecha de

---

[270] *Pueblo v. Báez López, supra*, pág. 930
[271] *Íd.*
[272] *Íd.*, págs. 930-932.
[273] *Pueblo en interés menor NOR*, supra, 965-966.
[274] *Íd.* citando a *Schenckloth v. Bustamonte*, 412 US 218 (1973)
[275] *Íd.* pág. 966; *Pueblo v. Santiago Alicea I,* supra, pág. 236.
[276] Regrabación de la vista del 28 de octubre de 2022, minutos 16:00 a 20:00.

nacimiento a la señora Nevárez Torres y dónde se encontraba, esta respondió su edad y que se encontraba en el hospital.[277] Destaco, además que, tras la extracción de sangre, la señora Nevárez Torres le había brindado su información para poder llenar el documento de remisión, que incluía su nombre, edad, dirección y lugar de trabajo.[278]

De igual manera, fue atestiguado en sala que, en el hospital, cuando el agente Torres Oquendo le explicó a la parte recurrida las advertencias sobre personas sospechosas de hacer funcionar o manejar un vehículo de motor bajo aparente estado de embriaguez, previo a la toma de muestra de sangre, esta indicó que entendía lo explicado y que iba a cooperar, aunque no iba a firmar dichas advertencias.[279]

En esa misma línea, de lo declarado en corte se desprende que, la enfermera Acevedo Nazario, al momento de realizarle ciertas pruebas a la señora Nevárez Torres, le colocó un pañal a esta última porque tenía la ropa húmeda y no olía bien.[280] Respecto a ello, la parte recurrida accedió a que se le colocara el pañal pero solicitó que no le quitaran la ropa.[281]

Los hechos anteriormente descritos demuestran que, la parte recurrida se encontraba capacitada para discernir en cuanto a su voluntad de cooperación y consentimiento.

Por otro lado, al evaluar el ambiente donde se prestó el consentimiento, somos del criterio que la señora Nevárez Torres prestó su consentimiento implícito en un ambiente libre de coacción e intimidación. Primeramente, esta no se encontraba bajo custodia, sino que, estaba en una institución hospitalaria donde habían otras enfermeras y enfermeros, y no únicamente el agente interventor. En

---

[277] Regrabación de la vista del 9 de noviembre de 2022, minutos 10:00 a 15:00.
[278] Íd. minutos 25:00 a 30:00.
[279] Regrabación de la vista del 28 de octubre de 2022, minutos 1:25:00 a 1:30:00.
[280] Regrabación de la vista del 28 de octubre de 2022, minutos 16:00 a 20:00.
[281] Regrabación de la vista del 28 de octubre de 2022, minutos 16:00 a 20:00.

el momento en que el agente Oquendo Torres le impartió las advertencias, se encontraban presentes los enfermeros Encarnación Soliman, Acevedo Nazario y Rivera Delgado.[282]  Inclusive, se desprende de los testimonios que, al momento de la toma de muestra de sangre, el agente Oquendo Torres se alejó del lado de la señora Nevárez Torres.[283]  No surge de ninguna forma que, la señora Nevárez Torres hubiese sido coaccionada o intimidada al momento de consentir a la toma de muestra de sangre.

Además, también surge de los testimonios que,  la enfermera Encarnación Soliman le orientó a la señora Nevárez Torres sobre la muestra de sangre que tenía que tomarle para conocer el nivel de alcohol en la sangre, y que esta le expresó que "no había ningún problema".[284]  La enfermera Encarnación Soliman narró que, cuando iba a tomarle la muestra de sangre a la señora Nevárez Torres, durante todo el proceso esta **se mostró tranquila y cooperadora** y que, **en ningún instante se negó a la toma de la muestra**.[285]  De hecho, indicó que, al momento en el que comenzó a tomar la muestra con el brazo izquierdo de la señora Nevárez Torres, como no vio vena, procedió a tomar la muestra en el brazo derecho.[286] Este hecho, también fue descrito por el agente Oquendo Torres[287], la enfermera Acevedo Nazario[288] y el enfermero Rivera Delgado[289].  Se desprende, además que, **mientras se le tomó la muestra, la señora Nevárez Torres no dijo nada, no se quejó y simplemente estiró el brazo.**[290]  La enfermera Encarnación Soliman puntualizó que, **la señora Nevárez Torres nunca se**

---

[282] Regrabación de la vista del 28 de octubre de 2022, minutos 1:25:00 a 1:30:00.
[283] Íd., minutos 1:35:00 a 1:40:00.
[284] Regrabación de la vista del 9 de noviembre de 2022, minutos 10:00 a 15:00; Regrabación del 29 de noviembre de 2022, minutos 20:00-25:00, y minutos 1:50:00 a 1:55:00.
[285] Regrabación de la vista del 9 de noviembre de 2022, minutos 30:00 a 34:36.
[286] Íd., minutos 16:00 en adelante.
[287] Regrabación de la vista del 28 de octubre de 2022 minutos 1:40:00 a 1:50:00.
[288] Regrabación del 29 de noviembre de 2022, minutos 25:00 a 30:00.
[289] Íd., minutos 1:50:00 a 1:55:00.
[290] Íd., minutos 25:00 a 30:00, 1:50:00 a 1:55:00.

**rehúso a ningún tipo de muestra o tratamiento con ella**. Especificó que, **ella "respondía a todo" y que "ella no estaba combativa"**.[291]   Recalcó que, si la parte recurrida se hubiese rehusado, no hubiese tomado la muestra.  De la prueba desfilada en sala, se puede corroborar lo atestiguado por la enfermera encarnación Soliman respecto a que, la señora Nevárez Torres se mostró tranquila y cooperadora, ya que, tanto la enfermera López Camacho[292], el agente Oquendo Torres[293], la enfermera Acevedo Nazario[294] y el enfermero Rivera Delgado[295] indicaron que **esta se encontraba tranquila y cooperadora en todo momento.**

Queda claro que la parte recurrida obedeció sin protestar al pedido del funcionario[296], pues no surge de la prueba presentada que esta se hubiese negado ni de forma expresa o tácita a la toma de muestra de sangre.  Al contrario, las acciones de la señora Nevárez Torres demuestran que brindó un consentimiento tácito de forma voluntaria conforme al derecho expuesto.  El consentimiento voluntario de forma tácita otorgado por la parte recurrida, constituyó una de las excepciones en las que no es indispensable una orden judicial previa.[297]

Finalmente, cabe destacar que, no nos convence el argumento de la parte recurrida respecto a que, el hecho de que el agente Oquendo Torres no le advirtió a la señora Nevárez Torres que podía negarse a que le realizaran la toma de muestras de sangre era razón suficiente para invalidar el consentimiento brindado por esta.  Como mencionáramos previamente, nuestro Máximo Foro ha sido sumamente claro al expresar que, **no es requerido que el titular del derecho esté consciente expresamente de que tiene derecho**

---

[291] Regrabación de la vista del 9 de noviembre de 2022, minutos 2:50:00 a 2:53:34.
[292] Regrabación de la vista del 28 de octubre de 2022, minutos 16:00 a 20:00.
[293] Íd., minutos 1:40:00 a 1:50:00.
[294] Regrabación de la vista del 29 de noviembre de 2022, minutos 50:00 a 55:00.
[295] Íd., minutos 1:50:00 a 1:55:00.
[296] *Pueblo en interés menor NOR*, supra, 965-966.
[297] *Pueblo v. Báez López,* supra, págs. 930-932.

**a no consentir**, pues la importancia se basa en demostrar la legitima necesidad de practicar el registro y la ausencia de coacción física o psicológica[298]. (*Énfasis suplido*)

Luego del examen ponderado y desapasionado de la totalidad de las circunstancias particulares de este caso, así como las características de la parte recurrida y el ambiente donde se prestó el consentimiento[299], colegimos que, el Ministerio Público logró demostrar que el consentimiento prestado por la señora Nevárez Torres fue uno voluntario donde no medió fuerza o violencia, ni coacción alguna.[300] Conforme a lo anterior, concluimos que el foro primario incidió al ordenar la supresión de la muestra de sangre obtenida de la señora Nevárez Torres.

**IV**

Por los fundamentos que anteceden, se expide el auto de *certiorari* y se revoca la resolución recurrida. Consecuentemente, se devuelve el caso al foro de primera instancia para la continuación de los procedimientos conforme a lo aquí resuelto.

**Notifíquese inmediatamente.**

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal de Apelaciones. El Juez Adames Soto emite Voto Particular Explicativo de Conformidad por escrito.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[298] P*ueblo en interés menor NOR,* supra, pág. 966
[299] *Íd.*; *Pueblo v. Santiago Alicea I,* supra, pág. 236.
[300] Véase *Pueblo en interés menor NOR*, supra, pág. 966; *Pueblo v. López Colón,* supra, pág. 289.

| Estado Libre Asociado de Puerto Rico<br>TRIBUNAL DE APELACIONES<br>Panel Especial | | |
|---|---|---|
| EL PUEBLO DE PUERTO RICO<br>Peticionario<br><br>v.<br><br>MAYRA ENID NEVÁREZ TORRES<br>Recurrida | KLCE202300933 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.<br>KLE2022G0122<br>KLE2022G0123<br>KLE2022G0124<br>KLE2021M0047<br>KTR2021-0605<br>KTR2021-0606<br><br>Sobre:<br>Art. 7.06 Ley 22 grave (2 cargos)<br>Art. 5.07 (C) Ley 22 grave<br>Art. 5.07 (B) Ley 22 menos grave<br>Art. 7.02 Ley 22 menos grave<br>Art. 5.07 Ley 22 menos grave |

Panel integrado por su presidenta, la Juez Lebrón Nieves, el Juez Adames Soto y la Jueza Martínez Cordero

### VOTO PARTICULAR EXPLICATIVO DE CONFORMIDAD DEL JUEZ NERY E. ADAMES SOTO

Estoy conforme con el resultado alcanzado y los fundamentos expuestos en la Sentencia que hoy suscribo. Por tanto, no me dispongo a utilizar este voto explicativo con la pretensión de reiterar lo que ya fue explicado, sino para atender un tema puntual, relativo al ambiente en el que la señora Nevárez Torres, (la recurrida), prestó su consentimiento.

Según fue plasmado en la exposición de derecho de la Sentencia que suscribo, al examinar y determinar si una persona ha prestado voluntariamente su consentimiento a un registro, resulta necesario: (1) tomar en cuenta las características de la persona que ha consentido[1] y; (2)

---

[1] Contrario a lo que concluyó el foro recurrido, según precisado en nuestra Sentencia, la prueba desfilada por el Ministerio Público sí aportó los elementos para poner en posición

el ambiente donde se llevó a cabo. A ello se debe añadir que **la validez de un registro consentido** es una cuestión de hecho que se determina mediate **un examen cuidadoso de la totalidad de las circunstancias que rodean el caso**. *Pueblo en interés del menor N.O.R.*, 136 DPR 949 (1994). (Énfasis provisto).

En la consideración del segundo de los elementos enumerados, que refiere al ambiente donde se llevó a cabo el consentimiento obtenido, nuestro Tribunal Supremo ha precisado que se nos requiere sopesar **si la persona fue amenazada**, **intimidada** o maltratada por la Policía; si descansó en promesas o representaciones falsas de la Policía, además del lugar donde se encontraba, en términos de si era público o aislado. *Pueblo v. Santiago Alicea*, 138 DPR 230, 237 (1993). (Énfasis provisto). En lo pertinente, en la Opinión que cité, el alto Foro reconoció la posibilidad de que un ciudadano se pueda sentir *amenazado* y, por esto, compelido a consentir, cuando la Policía le advierte que, si no consiente al registro, entonces buscará una orden del tribunal y hará el registro de todas formas.

Ciertamente, según se recogió en nuestra *Sentencia,* al resumir el testimonio del Agente Oquendo Torres en la vista de supresión de evidencia, este declaró, en lo pertinente, que mientras le leía las advertencias a la recurrida, *paso a paso,* **y le explicaba sus derechos**, también le indicó que *si se negaba* (a consentir) *iba a tener que ir a donde un fiscal para que fuera al tribunal a buscar una orden.* Ante lo cual resulta necesario preguntarnos si, examinada la totalidad de las circunstancias que rodearon el consentimiento de la recurrida para ser registrada, tal manifestación constituyó una *amenaza* demostrativa de coacción que invalidara el consentimiento dado, por compelido. Estoy convencido de

_____

al Tribunal de evaluar las características o factores personales de la recurrida, que demostraron que estaba capacitaba para dar su consentimiento al registro. Por ello, nada añadiré sobre este requerimiento, al sopesar si el consentimiento al registro fue voluntario.

que, hecho tal ejercicio, en modo alguno se puede sostener que la referida manifestación del Agente Oquendo afectara el carácter voluntario, libre de coacción, del consentimiento de la recurrida a que se le realizara la prueba de sangre.

En el ejercicio de sospesar la totalidad de las circunstancias del caso ante nuestra consideración, para fines del tema aludido, bien sirve iniciar por distinguir los hechos de *Pueblo v. Santiago Alicea*, supra, de los que estamos aquí valorando. En *Pueblo v. Santiago Alicea,* supra*,* el señor Santiago Alicea se encontraba en la esquina de un edificio donde residía en el Residencial Vista Hermosa con otros vecinos, cuando la Unidad de Operaciones Tácticas, **desplegando sus armas, rodeó su apartamento**. En ese momento, la señora María Rivera observó que estaban tratando de abrir una ventana del apartamento del señor Santiago, y **se negó al registro que la Policía se disponía a hacer allí**. Luego **un sargento de la Policía, junto al Fiscal** que dirigía la investigación, **amenazaron al señor Santiago con que, si no los dejaban entrar al apartamento, dejarían el edificio rodeado por la Unidad de Operaciones Tácticas de la Policía en lo que conseguían la Orden y entrarían de todas formas**. Luego de esta amenaza fue que el señor Santiago consintió el registro sin orden de su apartamento. Ante estas circunstancias particulares, nuestro alto Foro ordenó la exclusión de la evidencia obtenida como resultado de dicho registro, al estimar que el consentimiento fue producto de intimidación y coacción por parte de la Policía[2].

Muy contrario a tales hechos, en el caso ante nosotros no hay controversia de que, ocurrido el presunto choque, la recurrida no fue detenida en el lugar de los hechos, y llegó al hospital sin ser escoltada por algún miembro de la Policía, o se encontrara bajo arresto. El testimonio de la Enfermera López Camacho, que fue reproducido en nuestra Sentencia,

---

[2] Sépase que hubo dos fuertes e ilustrados votos disidentes, por parte de los entonces Jueces Naveira de Rodón y Negrón García, además de un voto concurrente del juez Fuster Berlingeri.

describe un trato normal a una paciente que llega al hospital por un accidente, sin rastro de la presencia de la Policía a ese momento, o algún elemento que sugiriera coacción o amenaza por las fuerzas del orden público, o de alguna otra persona, al momento de recibir servicios médicos. Cuando el Agente Oquendo Torres llegó a Sala de Emergencias y ubicó a la recurrida, de su testimonio surge que entabló conversación con esta mientras permanecía sentada en la camilla, la observó y describió que mostraba signos de embriaguez, los cuales detalló, no la puso bajo arresto y tampoco la esposó. Como ya señalé, luego del Agente explicarle paso a paso el proceso al cual la recurrida se iba a enfrentar, sobre sus derechos, es que hizo la expresión de que, si se negaba (a que le tomaran la prueba) *tendría que ir a donde un fiscal para que fuera al tribunal a buscar una orden*. Es decir, la referida expresión claramente ubica dentro del contexto de las explicaciones que el Agente le estaba dando a la recurrida, sobre los derechos que le asistían, sin sombra de algún dato que sugiera siquiera que este utilizó tal expresión con fines amenazantes, o que la recurrida así la hubiese interpretado.

Además, muy distinto a la situación de hechos ilustrada en *Pueblo v. Santiago Alicea,* supra, insisto, en este caso la recurrida llegó a recibir servicios médicos, sin haber sido detenida, en ningún momento antes de que consintiera a la prueba de sangre surge que estuviera esposada o inhabilitada de moverse, tampoco se narra de la presencia de otros policías, muchísimo menos aún algún operativo policial, recibiendo asistencia médica como otra persona ordinaria en caso de accidente, conversando con las enfermeras y el Agente Oquendo Torres, del cual tampoco se indicó que exhibiera el arma oficial o la tuviera desenfundada.

Por cuanto advertí que no reiteraría lo ya discutido en nuestra Sentencia, solo me permito resaltar que la descripción del personal médico que intervino con la recurrida, y del Agente Oquendo Torres, no refleja, en

modo alguno, que la expresión de este último, sobre procurar una orden del Tribunal para que ordenara el registro si esta se negare, exhibiera algún grado de amenaza que provocara la renuncia al derecho a ser registrada por temor, intimidación a amenaza. Tal como mis otras dos juezas compañeras de Panel, juzgo que la prueba desfilada demostró la voluntariedad de la recurrida al consentir la muestra de sangre, sin rastro perceptible alguno de la coacción que nuestra Constitución prohíbe al llevarse a cabo un registro voluntariamente consentido.

En San Juan, Puerto Rico, a 30 de octubre de 2023.


Nery Enoc Adames Soto
Juez de Apelaciones